**Paula MARTINEAU & Georganna Lagen, aka King, Petitioners–Appellants,**

v.

**Ron ANGELONE, Director of Prisons; Frankie Sue Del Papa, Attorney General for the State of Nevada, Respondents–Appellees.**

No. 93–15955.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 14, 1994.

Decided May 17, 1994.

---

735

Thomas D. Beatty, Las Vegas, NV, for petitioner-appellant Martineau, Aubrey Goldberg, Greenberg, Goldberg, Raby & Martinez, Las Vegas, NV, for petitioner-appellant Lagen.

William P. Henry, Deputy Atty. Gen., Las Vegas, NV, for respondents-appellees.

736

Before: GOODWIN, NORRIS and O'SCANNLAIN, Circuit Judges.

Opinion by Judge GOODWIN

GOODWIN, Circuit Judge:

Paula Martineau and Georganna Lagen, Nevada state prisoners, appeal the denial of their petitions for writs of habeas corpus. A Nevada state jury convicted them of involuntary manslaughter and child abuse following the death of Lagen's 27–month–old daughter, Michelle. The Nevada Supreme Court reversed the manslaughter conviction for insufficient evidence, finding that the state had not proven that either appellant injured Michelle or aided and abetted the other in doing so. *King v. State*, 105 Nev. 373, 784 P.2d 942 (1989) (per curium). However, the Nevada Court affirmed the child abuse conviction, concluding that appellants delayed in seeking medical care after Michelle was injured. *Id.*

On federal habeas, appellants argue (1) that the evidence did not show that they in fact delayed in seeking medical care; (2) that the state's use of battered child syndrome testimony violated due process; (3) that the Nevada Supreme Court violated the ex post facto clause by relying on a child abuse statute passed after Michelle's death; and (4) that the indictment failed to provide adequate notice of the charges because it alleged multiple theories of liability. We agree that the state failed to prove that King and Martineau delayed in seeking appropriate medical care and therefore REVERSE.[1]

## I. FACTS & PROCEDURAL HISTORY

In the summer of 1984, appellants, a lesbian couple, were living together in Las Vegas with Lagen's two children, then four-year-old Robert and then 27–month–old Michelle. Lagen and the children's father, Peter King, had separated the preceding summer and Lagen had custody of the two children. Lagen, an officer in the United States Air

Force, worked at Nellis Air Force Base in Nevada. While she was at work, the children stayed at the home of a baby-sitter, Andrea Goode. By long-standing arrangement, the children slept at Goode's house on Wednesday nights.

On Thursday, July 19, 1984, Lagen picked the children up at 3:30 p.m. after one of these overnight stays. According to Goode, Michelle seemed healthy, although unusually cranky and irritable. Goode, who was caring for a number of other children on July 19, did not see Michelle sustain any obvious injuries while in her care, and attributed the crankiness to teething or her recent chickenpox.

Some five and a half hours later, at 8:55 p.m., Martineau called 911 and reported that Michelle was not breathing. Clark County Fire Department paramedics responded and found Michelle lying face up on the dining room floor. She had no obvious injuries or bruises, but was not breathing and had no pulse. Lagen and Martineau said that they did not know what had caused Michelle's condition, but that, after dinner, Lagen suddenly noticed that Michelle was foaming at the mouth. They attempted CPR, and then called 911.

The paramedics were unable to revive Michelle and, by the time she arrived at the emergency room at 9:10, she was brain-dead. She died several days later.

### A. The Evidence Presented At Appellants' Trial

Martineau and Lagen were charged with murder, aiding and abetting murder, and child abuse. They were tried jointly, in April, 1987, almost three years after Michelle's death.

At trial, the state's theory was that Martineau and Lagen had beaten or shaken Michelle, causing her death. The state was unable to produce a coherent medical explanation of Michelle's injuries or any direct evidence of child abuse. Michelle showed no signs of previous abuse or neglect, and no

1. Because we reach this conclusion, we do not address petitioners' other claims, and express no opinion on their merit.

one testified that either Lagen or Martineau beat Michelle on July 19 or on any other occasion. Instead, the state relied primarily on circumstantial evidence and character testimony, arguing (1) that medical evidence suggested Michelle must have suffered a traumatic head injury while in appellants' custody; (2) that her injury likely caused obvious impairment and was unlikely to be accidental; (3) that Lagen and Martineau were under stress because of Peter King's custody suit; and (4) that Lagen and Martineau's accounts of the day's events were inconsistent, suggesting that they were lying about Michelle's injuries.

The medical evidence, which dominated the trial, can only be described as confusing. In essence, the doctors agreed that Michelle probably suffered a traumatic head injury,[2] but disagreed about the likelihood that the injury was caused by a fall,[3] about whether Michelle had a skull fracture,[4] about whether a certain mark was a bruise or a burn from a hospital heating pad, about what symptoms Michelle's injury would cause, and about the effects of her medical treatment, respirator and embalming. All of the doctors conceded that the injury could have been accidental and none could determine the exact time of injury.

In addition to this voluminous, but inconclusive, medical evidence, the state presented testimony from several neighbors, Michelle's father, nurses, the paramedics, and, over defense objections, an expert in battered child syndrome, Dr. Krugman. These various witnesses testified about appellants' discipline practices, about various allegedly inconsistent accounts the appellants had given of the events of July 19, and about appellants' demeanor during Michelle's hospitalization and death. Dr. Krugman opined that "discrepant history"—or an account of a child's injuries that conflicts with her medical condition—is evidence of child abuse.[5]

The only direct evidence about the events of the evening were appellants' out of court statements to police, paramedics, doctors and nurses, and Lagen's trial testimony.[6] According to these statements, after coming home from the babysitter's, the children played alone in Robert's room for a brief period, and then went swimming in the backyard pool. Since Lagen and Martineau were teaching Michelle to swim, swimming included throwing Michelle into the pool several times in order to teach her how to save

---

**2.** *But see* Testimony of Dr. Petty, TR 2165 (Michelle's injuries not inconsistent with "near drowning" or "partial drowning" whereby a person gets water into his lungs, seems fine, and then later deteriorates).

**3.** *Compare* Testimony of Dr. Petty, TR 2145, 2169 (injuries probably caused by a fall); Testimony of Dr. Barger, TR 1863–65, 1880 (injuries could have been caused by a fall); Testimony of Dr. Carlile, TR 1540 (injuries likely caused by shaking); Testimony of Dr. Greene, TR 2041 (disagreeing with Dr. Carlile about the shaking theory).

**4.** Drs. Carlile, Barger, and Reed testified that Michelle had a skull fracture; Drs. Greene, Mehringer, and Petty disagreed, believing the line was a developmental abnormality or "wormian bone," rather than a fracture. Dr. Mehringer found an entirely different fracture, which none of the other doctors diagnosed.

**5.** Dr. Krugman conceded that "discrepant history" ordinarily refers to a situation where a parent gives an affirmative explanation of a child's injuries which is inconsistent with the child's medical condition—i.e. the parent says "Tommy fell off his bike" but Tommy's injuries are wholly inconsistent with such a fall. TR 1931–32. Ap-

pellants, however, gave no such affirmative explanation; they simply said they didn't know what happened to Michelle. It is not clear that "I don't know" is in fact a discrepant account, particularly where the parent was away from the child for some period of time. In Michelle's case, the doctors could not determine when the injury occurred, or how it would manifest itself; Michelle was with a babysitter for some thirty-six hours on the day in question and Martineau was outside the house when the injury became apparent. Thus, "I don't know" might be an entirely consistent account of Michelle's injuries.

In addition, Dr. Krugman testified that "discrepant history" is only one of eight factors commonly associated with battered child syndrome, and admitted that none of the other factors applied to Michelle. TR 2026. For example, Michelle showed no other signs of being battered, no evidence of previous injuries and no signs of neglect. TR 2016–17. On appeal, appellants argue that the state court erred in admitting Dr. Krugman's testimony. Because we conclude that insufficient evidence supports appellants' conviction, even with Dr. Krugman's testimony, we do not address this argument.

**6.** Martineau did not testify.

herself if she fell in accidentally. The children also ran laps around the swimming pool for exercise. Although Michelle did, at one point, swallow and throw up some pool water, Lagen and Martineau felt this was nothing out of the ordinary. They said they did not see Michelle fall or sustain any obvious injuries while swimming and running.

After swimming, Michelle appeared very sleepy, and fell asleep at the dinner table. Appellants said they did not think her sleepiness was anything unusual, as Michelle was up later than usual and had a long, active day. Lagen or Martineau (each said it was the other one) took her from the table and laid her down on the floor near the dining room entrance-way. Robert went up to bed; Martineau went outside to walk her dogs.

Lagen stayed inside and did the dinner dishes while Michelle slept on the floor. After doing the dishes, Lagen looked over at Michelle and noticed that she was foaming at the mouth and having trouble breathing. She attempted CPR and then ran to the door and called to Martineau.[7] They again attempted CPR, and then, realizing that Michelle needed more help, Martineau called 911.

The state jury found both appellants guilty of child abuse and involuntary manslaughter. The trial judge denied appellants' request for a special interrogatory to determine the basis of the jury's decision. The judge sentenced each appellant to twenty years for child abuse and six years for involuntary manslaughter.

### B. *The Nevada Supreme Court's Ruling*

The Nevada Supreme Court reversed appellants' manslaughter conviction for insufficient evidence. *King v. State*, 105 Nev. 373, 784 P.2d 942 (1989) (per curiam). According to the court:

no evidence exists that both appellants committed the fatal act. Likewise, no evidence exists that one of the appellants aided and abetted the other in shaking Michelle or fracturing her skull. The fact that both of the appellants were in the home at the time of Michelle's injury does not suffice to prove that one aided and abetted the other.

*Id.*, 784 P.2d at 943–44. The Court nonetheless affirmed appellants' child abuse conviction because:

Nevada's child abuse statute encompasses acts of omission as well as acts of commission. NRS 200.508. Other jurisdictions uphold convictions of parents who failed to immediately seek or attempt to obtain proper medical treatment after finding the child in need of medical attention.... [B]oth appellants were "responsible for the safety or welfare of [Michelle]" NRS 200.-508(1)(b). Further, Dr. Carlile testified that Michelle might have survived if brought to the hospital sooner. Consequently, appellants allowed Michelle to "suffer unjustifiable physical pain" when they delayed in obtaining medical treatment for her. *Id.* Therefore, sufficient evidence exists to convince a jury, acting reasonably, of appellants' guilt beyond a reasonable doubt of felony child abuse.

*Id.*, 784 P.2d at 944 (internal citations omitted).[8]

Appellants thereafter filed this habeas action in federal district court pursuant to 28 U.S.C. § 2254. The district court dismissed their petitions, and they appealed.

## II. STANDARD OF REVIEW

 We review de novo a district court decision denying habeas relief. *Adams v. Peterson*, 968 F.2d 835, 843 (9th Cir.1992) (en

7. A neighbor who was talking to Martineau outside confirmed that Lagen came to the door and called to Martineau to "come quick." This neighbor, Phillip Medica, testified that he talked to Martineau outside for 10–15 minutes, at about 6:45 or 7:00 p.m. and then Lagen shouted from the door. He said the ambulance came 45 minutes after Martineau went inside, but on cross, admitted previously testifying that the ambulance came 10–15 minutes after Martineau went inside and said that he had not actually heard the ambulance but remembered his father telling him that an ambulance had come.

8. The Nevada Supreme Court's one-sentence rationales for affirming the child abuse conviction is a non-sequitur. The issue is not whether Michelle might have survived if brought to the hospital sooner, but whether Lagen and Martineau delayed in taking Michelle to the hospital.

banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 1818, 123 L.Ed.2d 448 (1993). However, a state court's factual findings are entitled to a presumption of correctness. 28 U.S.C. § 2254(d) (1988); *Collazo v. Estelle*, 940 F.2d 411, 415–16 (9th Cir.1991) (en banc), *cert. denied*, —— U.S. ——, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992). This presumption does not apply to a state court's resolution of mixed questions of law and fact. *Acosta–Huerta v. Estelle*, 7 F.3d 139, 142 (9th Cir. 1992).

## III. SUFFICIENCY OF THE EVIDENCE

■ "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). A state prisoner may therefore be entitled to federal habeas relief if he can show that the evidence adduced at trial was such that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979).[9]

Appellants contend, and the state concedes, that under the Nevada Supreme Court's ruling, the child abuse conviction can be upheld only if the state proved beyond a reasonable doubt that appellants committed an "omission"—i.e. that they "willfully caused or permitted" Michelle to suffer unjustifiable

physical pain by delaying in seeking medical care. NRS 200.508 (1977). Appellants argue that even "reviewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found proof of [delay] beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. We agree.

■ In order to prove child abuse based on delay, the state had to prove both (A) that some time passed between Michelle's injuries and appellants' 911 call and attempted CPR and (B) that, during this time, appellants knew (or should have known) that Michelle's injuries were serious enough to require immediate medical attention, yet did nothing.[10] *Cf. Fabritz v. Traurig*, 583 F.2d 697 (4th Cir.1978), *cert. denied sub nom Hopkins v. Fabritz*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979).

The state simply did not prove these facts. Neither the medical evidence nor any other evidence proved that any time elapsed between the time Michelle's injuries became apparent and the time appellants called 911; nothing presented at trial proved that Lagen and Martineau knew Michelle was seriously injured, yet did nothing.

### A. *The Medical Evidence On Delay*

■ The Nevada statute on its face requires the state to prove that some time elapsed between Michelle's injury and appellants' attempt to obtain medical treatment, and that during this time, Michelle suffered

9. Appellants suggest that a less deferential standard should apply in the instant case, as nothing in the record shows that the jury in fact found delay. Since the jury found appellants guilty of both manslaughter and child abuse, and the trial judge denied appellants' request for a special interrogatory, we cannot determine whether appellants' child abuse conviction is based on delay or battery. However, we do not address appellants' claim that they are therefore entitled to a less deferential sufficiency of the evidence review, because the evidence of delay is insufficient even under the stringent *Jackson* standard.

10. Neither the Nevada Supreme Court opinion nor Nevada case law clearly states the precise mental state required. The Nevada Supreme Court cited two out of state cases for the proposition that delay in seeking medical care could constitute child abuse within the meaning of

NRS 200.508. *See* 784 P.2d at 944 (citing *State v. Scott*, 400 So.2d 627 (La.1981) and *Priego v. State*, 658 S.W.2d 655 (Tex.Ct.App.1983)). In *Scott*, there was evidence of actual knowledge, as several persons told the parent to take the severely burned child to the doctor; in *Priego*, the Texas Court of Appeals reversed for failure to instruct on a lesser offense of recklessness. The Nevada child abuse statute, which refers to "willfully" causing a child to suffer unjustifiable physical pain, implies that the state had to prove appellants had actual knowledge of Michelle's need for medical care. We need not determine whether mere recklessness would be sufficient as a matter of Nevada law, as the evidence is not sufficient to show that defendants either knew or should have known that Michelle needed medical treatment at any time before they attempted CPR and called the ambulance.

740

"unjustifiable physical pain or mental suffering." NRS 200.508 (1977). In all of the cases imposing criminal liability for failure to seek medical care under similar statutes, the prosecution proved that the child's injuries existed for some extended period, that these injuries were obvious, and that the defendant either made no effort or made very inadequate effort to help the child. *See, e.g., State v. Scott*, 400 So.2d 627 (La.1981) (parents failed to seek medical help for three-year-old with severe burns covering 50% of his body for over two days, despite intervention of a family friend, the sheriff and DHS); *Elliott v. State*, 768 S.W.2d 351 (Tex.App.1989) (child died of ten-day old skull fracture and had multiple rib fractures that were fourteen days old and parent twice received advice to take child to hospital but refused to do so); *Kohler v. State*, 713 S.W.2d 141, 145 (Tex. App.1986) (child starved to death after prolonged period of suffering and grandparents advised parents to take child to hospital based on his "extreme" appearance); *Galvan v. State*, 699 S.W.2d 663, 669–70 (Tex.App. 1985) (child's problems had existed for two to three months, parents had resisted proffered help, and baby died of severe malnutrition, neglect, and alcohol intoxication).

In the present case, there is no such evidence of a delay between the child's injuries and appellants' decision to seek medical care. None of the many doctors who testified at appellants' trial indicated that significant time elapsed between Michelle's injury and appellants' 911 call.

Dr. Carlile, the emergency room physician on whose testimony the state Supreme Court relied, testified that going into cardiac arrest outside the hospital reduces a child's chances of survival from 70% to 10%. TR 1536. In response to a hypothetical question, he agreed that, if Michelle's injuries occurred two hours before appellants called 911, then bringing Michelle in earlier would have improved her chances of survival. *Id.*

However, contrary to the implication of the Nevada Supreme Court, Dr. Carlile did not testify that the injury in fact occurred two hours or even two minutes before appellants called 911. Rather, he said the "injury would have occurred certainly within a few hours of arrival at the hospital; two hours; one hour; immediately before." TR 1536. While he said that Michelle would not have gone into cardiac arrest immediately after her injury, he gave no indication as to how long it would have taken, TR 1538–39, and said he felt the injury was "fairly recent," or occurred "immediately before" Michelle came to the hospital. TR 1582–83. Other doctors testified that the time frame could have been "immediate," a "short interval" or "days," [11] and Dr. Carlile admitted that it was not possible to "nail down" the time of Michelle's injuries. TR 1564.

Other doctors either agreed that the time frame was unclear,[12] indicated the injury likely occurred within "short period of time" of Michelle's hospitalization,[13] or did not address the issue. The paramedics could not determine how long Michelle had been lying on the carpet, but saw no obvious signs of delay,[14] and none of the three nurses who treated Michelle testified that Michelle's con-

11. *See* Testimony of Dr. Greene, TR 2063–67 (time frame "could go from minutes to days" and could be "very rapid[ ]" or could take "a long time"); Testimony of Dr. Barger, TR 1872 (the time from the blow to the coma "may be immediate [or] a short interval"); Testimony of Dr. Reed, TR 2359–60 (head injury can lead to immediate cardiac arrest or it can take a period of several days).

12. *See, e.g.,* Testimony of Dr. Green, TR at 2041, 2064–65 (given the deterioration of Michelle's brain from being on life support, the brain is not helpful in determining the "time frame from the onset of the injury to the admission in the hospital"); Testimony of Dr. Barger, TR 1872 ("You mean from the blow to the time of unconsciousness? It may be immediate. It may have been a

short interval."); Testimony of Dr. Reed, TR 2359–60.

13. *See, e.g.,* Testimony of Dr. Reed, TR 2369–70 (Michelle's injury was an "acute injury [which occurred] within a short period prior to her arrival at the hospital").

14. Both Paramedic Love and Adams were asked how long Michelle had been lying on the carpet when they arrived. Love said he did not notice that she was cyanotic or bluish in color (which would indicate the passage of time), TR 1661, but said that he could not state with any medical certainty how long Michelle had been lying there. TR 1658. Adams testified that she seemed pale rather than blue. TR 1675.

dition showed that appellants unreasonably delayed in seeking medical care.

Thus, of the nine doctors, three nurses, and two paramedics who testified, only Dr. Krugman, the "battered child syndrome" expert, opined that appellants had delayed in seeking medical care. However, Dr. Krugman did not base his opinion on Michelle's medical condition, but "inferred delay" from his belief that appellants gave a "discrepant history" of Michelle's injuries, that "discrepant history" suggests child abuse, and that child abusers often delay in seeking medical help. He said he would not change his opinion even if the medical evidence suggested that Michelle was brought to the emergency room immediately after she was injured, TR 2018–20, and that delay could be as little as 10–20 minutes, depending on the injury. TR 1993–94.

■ Dr. Krugman's testimony, even if properly admitted,[15] is not sufficient to prove delay beyond a reasonable doubt. His opinion was based on an abstract theory of how child abusers behave, rather than on the medical evidence available in this case. It therefore has little, if any, probative value on the issue of how appellants in particular behaved, especially given the lack of evidence that appellants abused Michelle and the fact that none of the other doctors testified that any significant time elapsed between Michelle's symptoms and appellants' decision to call 911.

**B.** *Appellant's Uncontroverted Testimony Indicated that They Sought Medical Help As Soon As They Were Aware of Michelle's Condition.*

■ Moreover, the state had to prove not only that a delay occurred, but that during the delay, appellants knew (or at least should have known)[16] that Michelle needed medical care. "Appellant[s] cannot be held criminally responsible for knowledge of medical risks which are neither readily apparent nor known to [them]." *United States v. Robertson,* 37 M.J. 432, 440 (U.S.Ct. Mil.App.1993) (Gierke, J. concurring); *see also Fabritz v. Traurig,* 583 F.2d 697, 700 (4th Cir.1978), *cert. denied sub nom Hopkins v. Fabritz,* 443

U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979) (state alleging child abuse based on a mother's failure to seek medical care must prove "a consciousness of criminality" or knowledge of the "fatal nature of the child's illness").

In *Fabritz,* the evidence showed that the mother came home from a trip to find her three-year-old daughter sick and covered with over 70 severe bruises. *Id.* at 698. The mother bathed the child and put her in bed, but did not seek medical assistance for some eight hours, even though the child appeared "semiconscious," "feverish" and "sick." *Id.* at 699. By the time the mother called an ambulance, the child had stopped breathing; she died before reaching the hospital. The mother was convicted of child abuse based on this delay. The Fourth Circuit granted habeas relief because the state showed only "an error of judgment, however dreadfully dear," and did not show any "awareness of wrongdoing on [the mother's] part." *Id.* at 700. Similarly, in *Robertson,* the defendant's fourteen-year-old son died of anorexia after losing weight for some three months. The United States Court of Military Appeals reversed the father's negligent homicide conviction for insufficient evidence because, though the father had failed to obtain medical treatment for his son, he did not fully appreciate the magnitude of [his son's] symptoms. *Id.* at 438.

Michelle's injuries were far less obvious than those in the cited cases, and existed for a far shorter period of time. In contrast to Fabritz's child, Michelle had no obvious injuries or bruises when she arrived at the hospital room, and there was no testimony that she had displayed any symptoms (other than sleepiness) before appellants called 911. In contrast to Robertson's son, whose symptoms existed for over three months, Michelle, by all accounts, had no obvious symptoms five hours before appellants called the ambulance.

Even viewed in the light most favorable to the prosecution, the state's evidence did not show that appellants knew (or must have known) that something was wrong with Michelle at any time before they called 911. All of the doctors admitted that a person's re-

---

**15.** *See* note 5, *supra.*

**16.** *See* note 10, *supra,* re mental state.

sponse to a head injury such as Michelle's varies.[17] While most doctors testified that the injury would have caused immediate impairment and some thought it would likely cause immediate unconsciousness, none testified with certainty that Michelle's injuries would have been so obvious that a layman would have known she was at imminent risk.

The doctors were unable to testify "when and if any, or all, of the symptoms would necessarily occur" and "could only use words describing the symptoms as 'usually,' 'generally,' and 'most commonly.'" *State v. Lilly,* 468 So.2d 1154, 1159 (La.1985) (finding such medical testimony insufficient to convict a mother whose eight-day-old baby died of meningitis).

Thus, even if a reasonable jury could infer from appellants' statements that Michelle must have been injured sometime before dinner, nothing contradicts appellants' statements that Michelle seemed merely "sleepy" up until the time she began foaming at the mouth and appellants called 911.[18] The state did not even prove that appellants made an error in judgment, or waited for any length of time before attempting CPR and calling an ambulance, much less that they knew Michelle was injured and did nothing.

## IV. CONCLUSION

We recognize that the death of a young child such as Michelle is an unnatural trage-

17. Dr. Reed testified that head injuries can lead to immediate arrest or can "over a period of hours to days lead[] to progressive brain swelling ... [which] causes one to arrest." TR 2359–60. He said that, "in the beginning, there may be only irritability, fussy and a little sleepy," and that it was "difficult to assess a young child" with such an injury because they could not articulate how they were feeling. TR 2360. He noted that "it is possible to have a massive skull fracture and have no alteration in level of consciousness and no coma." TR 2364. Finally, he agreed that one could come into a hospital having received a head injury, seem healthy but later die, and noted that he had treated a man who came into the hospital, gone home seeming fine, and then died in his sleep. TR 2365.

Dr. Barger thought the injury would cause immediate unconsciousness, TR 1863, but agreed that Michelle could have been briefly unconscious, then recovered and seemed normal, and then gone into a coma, TR 1872, 1892.

Dr. Green thought the injury might not cause unconsciousness, but that Michelle would have shown signs of mental impairment from the time of the injury. TR 2050. However, he added "may perhaps act normal for a few minutes" after such an injury and that "a head injury ... can be quite severe and not lead to unconsciousness." TR 2062. He related in detail an incident involving his own daughter where she had a severe skull fracture but "lay on the ground talking to me." TR 2062, 2077, 2080.

Dr. Sheignhorn noted that it would be "possible" for a seemingly minor injury or an injury from which a person seemed to recover to produce serious symptoms at some later time, and said that the hospital particularly warns head injury patients, even those who appear unhurt, to watch for certain symptoms. TR 1636. He emphasized that head injuries and "what they term a concussion" are "distinctive" in that "the progression of symptoms is important, and, you know, a seemingly minor injury could [] herald

the beginning of what could progress to be a severe injury." TR 1639.

18. The prosecution relied heavily—and continues to rely heavily—on its claim that appellants gave inconsistent accounts of the evening. However, none of these supposed inconsistencies contradicts appellants' basic story that they did not realize anything serious was wrong with Michelle until shortly before they called the ambulance. Moreover, having carefully reviewed these inconsistencies, we find them less probative than the state claims. Given the length of time between Michelle's death and the trial (three years), that a paramedic remembered being told that Michelle was "playing" rather than "laying" on the floor before she began foaming at the mouth, that some neighbors thought appellants said Michelle was "in bed" rather than asleep on the floor, and that one neighbor even thought Michelle was alone with Martineau rather than with Lagen when she became sick does not prove very much. These various witnesses themselves gave inconsistent statements during the investigation and trial. Moreover, Martineau, who was allegedly outside when Michelle first became symptomatic, may have been confused about exactly what happened before Lagen called to her.

Testimony that Lagen was "cold" when she visited Michelle in the hospital and had once called Michelle a "bitch," as well as the various evidence about Martineau's intolerance of the children's eating habits and appellants' practice of having the children eat at a separate table and stay in bed until Lagen woke up in the morning is also insufficient. Whatever the probative value of such character testimony and strangers' evaluations of a person's demeanor, especially when given some three years after Michelle's death and some two years after appellants were accused of child abuse, the evidence does not prove that either Lagen or Martineau knew Michelle needed medical care, yet failed to obtain it.

dy, and that, in the face of such a tragedy, there is a societal incentive to assign blame, to hold someone responsible. We also recognize that child abuse is a crime that often has no witnesses and is consequently difficult to prove. Because of these facts, the state complains, child abuse may often go unpunished.

However, much as the death of a two-year-old child demands an explanation, we must also be concerned about due process and the constitutional mandate that all persons be presumed innocent until proven guilty. In this case, the state was unable to explain why Michelle died. Her death could have been due to circumstances beyond appellants' control; it could have been an accident, a medical anomaly, a failure to observe Michelle's symptoms, or an error of judgment. Given the Nevada Supreme Court's conclusion that the evidence was insufficient to permit a jury to convict for manslaughter, the remaining evidence, circumstantial, medical and direct, simply cannot be sufficient to convict appellants of willful neglect or delaying in seeking medical care. Nothing contradicts appellants' claim that they did everything they could to save Michelle.

In light of the lack of competent, probative evidence, we must REVERSE the district court's denial of habeas relief. The case is remanded to the District Court with instructions to grant the writ.