*1317 Springer, J.,
concurring in part and dissenting in part:
I concur with remanding this matter for resentencing, but I dissent to the remaining judgment of this court because there are two errors in this case that require reversal.
The most obvious error is the trial court’s failure to instruct the jury on the lesser degree of the crime of child neglect. Child neglect is a gross misdemeanor unless there is proof of “substantial bodily or mental harm.” Proof of the added element of substantial bodily or mental harm raises the crime of child neglect from a gross misdemeanor to a felony calling for a maximum of twenty years in prison.
NRS 175.201[1] requires not only that a jury must be instructed on the degrees of an offense, it also requires that the jury be instructed that if there is a reasonable doubt as to which degree is proven, the defendant is to be convicted of the lowest degree. Ms. Rice was denied the benefit of this statute. See Lisby v. State, 82 Nev. 183, 414 P.2d 592 (1966).
Although I believe that it was error per se for the trial court not to instruct on the lesser offense, I would point out that the omission was particularly disastrous to this defendant because this case looks much more like a gross misdemeanor case than a felony case, and the jury should have had the chance to bring in a verdict of the lesser offense.
The jury was not given a chance to decide that injuries suffered by reason of delay in seeking medical attention were less than “substantial,” which is to say, injuries which created a substantial risk of death, loss or impairment of the function of a bodily organ or member, or prolonged physical pain. NRS 200.060. As I will demonstrate, proof relating to “substantial” injury in this case must be related to the scald injury and the scald injury alone. It is very difficult to conclude that Ms. Rice’s deciding not to call in professional medical care until the scalding reached the blister stage resulted in “substantial” injury, as defined by NRS 200.060. I find no evidence in the record that this delay was the cause of any increased or unnecessary suffering on the part of the child. The intentional scalding inflicted by the child’s father was what caused the child’s injuries, not Ms. Rice’s delay in calling the doctor. The evidence in this case certainly would support a *1318 jury finding that Ms. Rice’s delay in getting medical treatment for the scalding did not result in any appreciable detriment to the child and that it could not possibly have resulted in injury of a “substantial magnitude — risk of death, loss of a bodily organ or prolonged physical pain.” It is safe to say, given the circumstances of this case, that if Ms. Rice were guilty of child neglect at all, she would be guilty of gross misdemeanor child neglect and not felony child neglect. That the jury did not have the opportunity to convict Ms. Rice of the lesser degree of child neglect is so prejudicial as to call clearly for the reversal of her felony child neglect conviction.
Apart from the obvious error present in the trial court’s failing to instruct on the lesser degree of child neglect, a momentous error has been committed in this case. This error, which has been ignored by this court, threatens to put in jeopardy future child neglect convictions, convictions which, like the conviction in this case, will be judged by federal judicial authority to be in violation of the federal constitution and in direct contravention of federal cases in point. The error to which I refer is the failure of the trial court to define and instruct properly on the mental element of the crime of child neglect, the mens rea.
Mens rea, sometimes referred to in terms of “guilty mind,” “consciousness of criminality” or “wrongful purpose” is a necessary element of any crime. Ms. Rice cannot be guilty of a crime simply because she exercised bad judgment in not calling in medical attention for her child’s scald injury; yet that is what this case is all about.
As I will maintain throughout this opinion, Ms. Rice cannot be guilty of a crime unless she knew or should have known that a delay in calling a doctor was going to cause unjustifiable injury to her son.[2] As matters stand, Ms. Rice was incorrectly convicted of *1319 a crime when, at most, she was guilty of negligence. The indictment charged that Ms. Rice “neglected ... to seek appropriate [reasonable and proper] medical treatment.” The court instructed the jury (Instruction No. 15) that “ ‘neglect’ includes negligent treatment” and the “negligent . . . care, control and supervision or lacks the subsistence, medical care or other care necessary for the well-being of the child.” This is a negligence case. We must bear in mind that the difference between mere negligence and criminal misconduct is that in a negligence case the actor is held civilly liable for failure to perceive danger; whereas, in criminal cases the actor is held criminally liable for being aware of an impermissible risk and acting in spite of the danger. There is no charge, nor is there evidence to support a charge, that Ms. Rice knew of a danger and that she knowingly disregarded a known danger.
When Ms. Rice tried to take the case out of the negligence realm and into the criminal by asking for an instruction defining the word “willfully” in terms of a deliberate and knowing omission as distinguished from mere inadvertence or negligence, the trial court refused the request and, instead, defined “willfully” in terms of a mere “willingness to commit the act.” Under the court’s instruction, Ms. Rice could be held criminally liable just for failing to perceive a danger in not calling for immediate medical attention, without regard to her knowledge of the danger that might be inherent in the delay. This, then, is a negligence case, not a criminal case. Ms. Rice has gone to prison for twenty years for negligence. This is a violation of Ms. Rice’s due process rights under the Fourteenth Amendment of the Constitution of the United States.
Not long ago the Ninth Circuit Court of Appeals invalidated a Nevada criminal conviction for child neglect because “[n]either the Nevada Supreme Court opinion nor Nevada case law clearly states the precise mental state required [for a conviction of child neglect].” Martineau v. Angelone, 25 F.3d 734, 739 n.10 (9th Cir. 1994). The federal appeals court made it very clear to us that in order to convict for child neglect the state must define the mental state required for conviction. It has told us that there must be something more than mere parental negligence and told us that there had to be proof of guilty knowledge or scienter on the part *1320 of a parent before a parent could be held “criminally responsible.”
In Martineau, a case very much like the one now before us, the Ninth Circuit held that in cases of delayed medical treatment, parents “ ‘cannot be held criminally responsible for knowledge of medical risks which are neither readily apparent nor known to [them].’ ” Id. at 741 (quoting United States v. Robertson, 37 M.J. 432, 440 (C.M.A. 1993) (Gierke, J., concurring). As was the case at the time of Martineau, presently, in this state, neither state statute nor case law defines the mental state required for a conviction of child neglect; and until such definition is provided, we will continue to face federal intervention under the constitutional principles which are announced in Martineau. The superficial opinion which accompanies the affirmance of this conviction invites another federal habeas corpus writ by reason of the clear violation of Ms. Rice’s federal right to due process of law that results from punishing her criminally for mere negligence and in the absence of the universal requirement for criminal liability, mens rea, criminal intent.
Ms. Rice was charged with a violation of NRS 200.508. This statute, in addition to dividing child neglect into two separate crimes, one a gross misdemeanor, the other a felony, defines the offense in terms of two different kinds of conduct. One crime is committed (under NRS 200.508(1)(a)) by a person who actively “causes a child” to suffer unjustifiable pain; the other crime is committed (under NRS 200.508(1)(b)) by a person who passively “permits or allows” a child to suffer unjustifiable pain or to be placed in a situation where the child “may suffer” pain. Such an omission must, however, as I have said, be made with “ ‘knowledge of [the] medical risks.’ ” Martineau, 25 F.3d at 741 (quoting Robertson, 37 M.J. at 440 (Glerke, J. concurring)).
Although the indictment charges that during a one-week period (September 14-22, 1992) Ms. Rice “caused or permitted the victim to suffer unjustifiable” pain, there is no allegation or proof that would indicate any culpable conduct on the part of Ms. Rice during this period other than that she negligently “permitted” her son to suffer injury because she “neglected, delayed or refused to seek appropriate medical care.”
It should be noted early on that Ms. Rice is not charged with having “permitted” the child’s father to kill the child by inflicting upon the child fatal blunt injuries to the skull and brain. The State does not blame Ms. Rice for negligently permitting the child’s father to beat the child to death; the State charged and attempted to prove only that Ms. Rice neglected “to seek appropriate medical treatment” for three kinds of injuries, namely, (1) malnourishment, (2) failure to thrive and (3) “second degree *1321 burns the child received while under the care of the defendant and/or CODY A. RICE.”
It is important to note that it is readily apparent from a reading of this record there was no attempt to prove that Ms. Rice neglected to seek appropriate medical care to treat the child’s mainourishment. It is clear from the record that the child suffered malnourishment, but only as a result of a bout with pneumonia and the child’s hospitalization for this disease. The child lost weight while in the hospital, and after recovering from his pneumonia had trouble digesting his food because of mucus that remained in his stomach as a sequela to the pneumonia. The record shows that the child had difficulty in gaining weight after his illness and that a district health nurse, Jeanette O’Brien, made a home visit during this time and talked to Ms. Rice about the child’s nutritional problems. The nurse observed that Ms. Rice “was very good with the baby” and “very loving and attentive to infant’s needs.” There is certainly no evidence during the one-week period charged in the indictment that Ms. Rice neglected to get appropriate medical attention for the malnutrition.
With regard to the charged “failure to thrive,” there is no evidence in the record as to what this term might mean. One of the testifying physicians, Dr. Clark, testified that he was not qualified to give an opinion as to whether the child had “failed to thrive.” The other testifying physician, Dr. Powell, did not testify that the child failed to thrive. Failure to thrive is a problematical diagnosis, and it is very difficult to trace its etiology. There is no evidence that any neglect on Ms. Rice’s part in seeking “appropriate medical treatment,” brought about the “failure to thrive” syndrome, much less evidence that such neglect caused “substantial bodily or mental harm” to the child. The only possible “unjustifiable” pain that Ms. Rice may have “permitted” her child to suffer was that connected with the “second degree[3] burns” the child received.
The scalding in question was intentionally inflicted upon the child by the murderer, Cody Rice. Cody Rice told Ms. Rice that the child had been accidentally scalded while he was giving the child a bath. When Ms. Rice got home from work that evening, she expressed her concern about her son and suggested to Cody that they should take him to the hospital for treatment. Cody would not permit this and ordered Ms. Rice to treat the child for *1322 the scald at home. Ms. Rice testified that at this time she was “terrified” of Cody and that he had threatened to kill her on a number of occasions. The scalding looked pink and much like a sunburn. Ms. Rice bathed her baby son and dressed the scalded tissue. An independent witness saw the scalded area on September 18, 1992, and said that it looked like a sunburn. When the scalding started to blister, Ms. Rice again suggested that they get medical attention for the child, but Cody “exploded,” screaming and throwing things. Ms. Rice spent the rest of the night in fear, holding her baby to her chest all night long. She told Cody that she was going to take the child to the doctor on the next day no matter what. On that day Cody beat the child to death.
Now it seems to me that if the child had been suffering from some serious disease that placed the child in danger of death or permanent physical impairment, it could be argued that the mother was obliged, at least morally, to risk her own life and to call in medical care in order to save her child’s life; but this was not the case here.[4] It can of course be argued that the mother *1323 exercised poor judgment in not having the scald attended to sooner, but it is very hard to argue that her treating the boy at home caused the child to “suffer unjustifiable physical pain,” much less “substantial bodily or mental harm” in the form of a life-threatening situation or the other defining conditions of substantial bodily harm. It was Cody Rice that caused the child to suffer unjustifiable physical pain and not Ms. Rice; and there is absolutely no evidence that any failure on the part of Ms. Rice to bring in professional care for the scald injury inflicted by the child’s father caused the child to suffer any more or any less pain than that which was intentionally inflicted by the father. Ms. Rice treated the child at home with unguents and coverings and baby pain-relievers. There is no evidence that a doctor could have or would have done things differently.
This whole case and Ms. Rice’s having to spend twenty years in prison are based, at the very most, on an error in judgment on her part, an error committed when she decided not to risk her life in order to have the pre-blister scald injury attended to by a doctor instead of treating it at home. There is nothing at all to indicate that the child was any the worse off because of this decision, and certainly nothing to indicate that treating the child at home caused the child to suffer any harm as a result of Ms. Rice’s arguably bad decision, much less proof that the child suffered “substantial bodily or mental harm.”[5]
*1324 Having an understanding of the nature of the charges and the factual background of this case enables us better to understand the injustice of this conviction. This leads me to discuss further the major error in this case, the constitutional violation of due process that was committed by the trial court in allowing this woman to be convicted of a crime for, at most, being neglectful and in having negligently “permitted” her child to suffer by reason of her decision to delay medical treatment for a scald injury suffered at the hands of her murdering husband.
As I have mentioned above (citing Martineau v. Angelone, 25 F.3d 734 (9th Cir. 1994)), neither the statute nor our case law has, as of yet, has defined “the precise mental state required” in child neglect cases. 25 F.3d at 739 n.10. Obviously, the mental state required for a criminal child neglect conviction has to go beyond mere negligent child supervision, or all parents would be in jeopardy. It is a rare parent indeed who does not, at some time or another, fall below the standard of “due care” expected of a “reasonable” parent. What this court should be doing now, and what this court has completely failed to do, is to define the “mental state,” the mens rea that is an essential element of the subject crime. Without such definition the present conviction suffers from the same constitutional infirmities that resulted in the release of the convicted defendant in Martineau.
As mentioned, Ms. Rice tried, unsuccessfully, to get the trial court to define the requisite mental element of the charges against her. Ms. Rice requested the trial court to give an instruction to the jury which reflected the necessity for the State to prove something more than negligence, more than mere breach of duty. She wanted the court to instruct the jury that her decision to delay medical attention had to have been made with some kind of guilty “knowledge” that delay in seeking professional medical attention for her son would result in “unjustifiable pain.” Otherwise put, Ms. Rice sought to have the jury instructed that if her decision was merely an error in judgment, she could not be convicted of a crime. The trial court refused the instruction. The trial court should have been guided by Martineau, in which a Nevada child neglect conviction was invalidated in a case in which it was also charged (under the same statute as here) that a parent had permit *1325 ted a child to suffer as a result of a failure to call in timely medical attention. The Martineau opinion makes it very clear that it is necessary for the state to prove that defendants charged with child neglect “knew (or should have known) that the [child’s] injuries were serious enough to require immediate medical attention, yet did nothing.” Id. at 739. The Martineau court ordered the defendants released on habeas corpus, observing that the state simply did not prove these facts, namely, that the defendants “knew (or should have known) that [the] injuries were serious enough to require immediate medical attention.” Id.
Although the majority thinks that the Martineau habeas corpus writ was “[b]ased solely on a lack of sufficient evidence,” the lack of evidence in Martineau related to lack of proof of the mental element of the crime, the requirement that defendants in child neglect cases must have known or should have known of the need for immediate medical attention and that they failed or refused to act on this knowledge. I see the thrust of the Martineau case as being disapproval by the federal court of Nevada’s failure to provide and apply a properly defined “mental state” as an element of the crime of child neglect.
If I have read Martineau incorrectly, there are other federal cases that deal even more directly with the point. For example, in a case that is very suggestive of the present one, Fabritz v. Traurig, 583 U.S. 697 (4th Cir. 1978), cert. denied sub nom Hopkins v. Fabritz, 443 U.S. 915 (1979), a mother of a three-year-old daughter came home from a trip to find her daughter ill and covered with bruises. The mother hesitated to get medical care because she was embarrassed about taking the child to the hospital in that condition; so she treated the child at home as best she could. After about eight hours the child stopped breathing. She called an ambulance, but the child died on the way to the hospital. On federal habeas corpus, the Fourth Circuit held that the conviction violated the due process clause of the Fourteenth Amendment because:
[T]he evidence is utterly bare of proof of a consciousness of criminality during her bedside vigil. This may have been an error of judgment, however dreadfully dear, but there was no awareness of wrongdoing on her part. . . . Without expert medical knowledge to place her on notice of the fatal nature of the child’s illness, she treated her as best as she knew. The misjudgment was only to the significance of the symptoms and of the immediacy of the demand for professional care.
583 F.3d at 700.
The majority neglects to discuss the court’s failure to instruct *1326 the jury that it had to find not only that there was danger in Ms. Rice’s delay in bringing in professional help to treat the scalding, but also that Ms. Rice was aware of the danger. Absent an instruction on the necessity to prove knowledge or awareness of the risk, the jury was free to bring in a guilty verdict (as it did) based on negligence alone and on the basis of a mere “misjudgment,” as mentioned in the Fabritz case.[6]
I may be overstressing the point, but I must emphasize that a parent’s mere failure to call the doctor in case of a child’s illness or injury, of itself, cannot amount to criminal conduct. It happens every hour, every day. For criminal liability to be imposed, there must be some “consciousness of criminality,” as put in the Fabritz case. All the court required the jury to find here was that Ms. Rice did not seek medical attention for her scalded son. This is not enough to support a criminal conviction. Ms. Rice attempted to interject the mental element, the scienter element, but her instruction was refused by the court.
Ms. Rice tried to persuade the court to define the “willfully” element of violation of NRS 200.508 in terms of scienter or knowledge that her actions were wrong. The instruction offered by Ms. Rice was taken verbatim from Robey v. State, 96 Nev. 459, 611 P.2d 209 (1980). Robey taught that the word “ ‘willful’ ” when used in criminal statutes with respect to proscribed conduct relates to “an . . . omission which is done intentionally, deliberately or designedly, as distinguished from an . . . omission done accidentally, inadvertently or innocently.” Robey employed such terms as “culpable mind” and “conscious commission of a wrong” to distinguish culpable, criminal misconduct from mere misjudgments and negligence.[7] It was clear error for the trial *1327 court to refuse to instruct on the mental element of this crime. The trial court had the opportunity to instruct the jury, in accordance with Robey and thus, at last, to define “the precise mental state required” for conviction in these kinds of cases. Martineau, 25 F.3d at 739. The trial court, contrary to Robey, defined “willfully” as meaning “simply a purpose or willingness to commit the act or to make the omission in question.” In other words, to be guilty under this instruction, all Ms. Rice had to do was to be “willing”[8] to “make the omission” to call the doctor to attend to her son’s scalding, that is to say, to have made the conscious decision not to seek professional assistance in treatment of the scald, with or without knowledge of the danger involved.[9]
In sum, then, the majority opinion is at odds with Martineau; and it was constitutional error for the trial court not to have instructed the jury that Ms. Rice could not be convicted of a *1328 crime unless it found that she “knew or should have known” that a delay in treating her son’s scalding would result in the child’s suffering “unjustifiable physical pain or mental suffering.” Ms. Rice cannot stand convicted for a crime just because she did not call the doctor. She may have exercised poor judgment in not calling in professional medical help when she discovered that her husband had “accidentally” caused her son to be scalded in the bathtub, but this is not the same as knowing that her son would suffer “unjustifiable” pain because she decided to treat him at home.
Although there are a number of errors in this case, I have stressed two errors in contending that this conviction must be reversed. The most obvious error is the court’s failure to tell the jury that there were two possible crimes here, the gross misdemeanor and the felony.[10] Ms. Rice was greatly prejudiced by reason of the jury’s not knowing that it could have brought in a conviction for a lesser offense, based on the facts in evidence.
Still, the main reason why this conviction must be reversed, and the reason of most concern to me, is that this court has still not defined “the precise mental state required” in child neglect cases and has ignored the ruling in the Martineau case relative to the scienter requirement that a defendant charged with this crime must have known or “should have known” that any failure or delay in calling in medical attention was going to result in “unjustifiable” pain being suffered by the child. 25 F.3d at 739 n.10. I hate to see this court ignoring the clear constitutional mandate imposed upon us by the Martineau case; but, even worse, I hate to see its dereliction in refusing to deal with the problem of what mental state must be shown in order to establish *1329 criminal liability in child neglect cases. This is a matter that clearly must be addressed by the court; and this is the principal reason for my dissenting to the majority opinion.[11]

 NRS 175.201 provides as follows:
175.201 Presumption of innocence: Conviction of lowest degree of offense. Every person charged with the commission of a crime shall be presumed innocent until the contrary is proved by competent evidence beyond a reasonable doubt; and when an offense has been proved against him, and there exists a reasonable doubt as to which of two or more degrees he is guilty, he shall be convicted only of the lowest.

 Since the judgment was entered in this case, the court has given its attention to the mental element in child neglect cases. In Smith v. State, 112 Nev. 1269, 927 P.2d 14 (1996), this court pointed out the difference in the child abuse/neglect statute between the willful abuse crime described in NRS 200.508(1)(a) and the child neglect crime described in NRS 200.508(1)(6). The court conceded that the “statutory definitions of ‘allow’ and ‘permit’ . . . are not drafted as clearly as would be preferred” and went on to declare the mental state required for conviction of child neglect under NRS 200.508(1)(b). Smith, 112 Nev. at 1276-77, 927 P.2d at 18. The court decided to read the two statutory definitions of allow and permit “in conjunction and conclude that both definitions establish the same requirement: a person acts unreasonably and is therefore criminally liable if she knows or has reason to know of abuse or neglect yet permits or allows the child to be subjected] to it.” Id.
The foregoing, necessary elaboration of the mental element of child neglect is all that Ms. Rice wanted presented to the jury — namely, that, as it was put in the Smith case, the court “define[] the state of mind required for a *1319 finding of guilt and effectively precluded punishment for inadvertent or ignorant acts.
If the jury had been told in this case that Ms. Rice could be held “criminally liable” only if she knew her child was being abused and that she consciously permitted this abuse to continue and that she could not be prosecuted for “ignorant acts,” she would have received a fair trial and probably would have been found not guilty.

 A first-degree burn is one that involves only the outer layer of skin (the epidermis), ordinarily without blistering. A second-degree burn involves “the epidermis and dermis[, ] usually forming blisters.” A third-degree burn involves tissue beyond the skin itself. Stedman’s Medical Dictionary 201-02 (5th Unabridged Lawyers’ Ed. 1982). As described in the text, the scalding was similar to a severe sunburn.

 he majority opinion correctly points out that Ms. Rice’s decision to postpone professional treatment of the scald was “because she was afraid of what Cody would do to her if she did not [obey him], especially because Cody had threatened to kill them all many times.”
Dr. Lon Kepit, a clinical psychologist who specializes in these kinds of cases diagnosed Ms. Rice as suffering from “battered woman syndrome.” Dr. Kepit had this to say about Ms. Rice:
Here’s the important thing. Because she loses sight of the personal boundaries for herself, she also loses them with Matthew. And really relevant is the fact that she’s unable to assess danger accurately.
What is not unusual in these cases where women are abused, is that they truly believe that the child will not be hurt. * * *
And the other point I think that needs to be made here is, that, many cases leaving a relationship that’s abusive can be life threatening. She was already in a situation, in my professional opinion, that was life-threatening. There were incidents with Cody with guns and knives and enough violence that she could have essentially been killed, hurt, maimed.
It is also my professional opinion, not only was she a battered woman, but she was under duress and imminent danger. . . .
Almost twenty years ago, Dr. Lenore Walker described and defined the battered woman syndrome in her book The Battered Woman. Dr. Walker has written ten books on the subject of domestic violence, and her term, “battered woman syndrome,” is a generally accepted explanation of the psychological impact of the kind of abuse suffered by Ms. Rice at the hands of Cody Rice. The gist of the syndrome as manifested in this case is Ms. Rice’s inability to assess the danger to her child and her true belief that her child was not going to be harmed. (See reference to Dr. Kepit’s evaluation in the text of this dissent.)
I realize that the battered woman syndrome is just one of a number of theories employed in the social sciences to explain such apparent paradoxes as battered women’s not leaving their batterers and putting their children under risk of abuse from a violent domestic partner. The syndrome as *1323 delineated and later elaborated by Dr. Walker is based on clinical studies and experimental animal studies of abuse. See, e.g., Martin Seligman, Helplessness: On Depression, Development and Death 75-106 (1975). The battered woman syndrome is often accepted by the courts to explain and justify the actions of women who are accused of crimes. The theory amply explains why Ms. Rice may have delayed her decision to call in professional care until the baby’s back started to blister.

 Actually, the gross misdemeanor crime is the only crime which the evidence in this case could possibly support. To be guilty of felony child neglect, Ms. Rice’s negligence had to result in “substantial bodily harm,” which is defined as injury “which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ or prolonged physical pain.” NRS 200.060. We must remember that, at most, we are dealing with Ms. Rice’s neglect in calling in professional medical care for the child’s scalding. As stated, the child’s father beat the child to death, fracturing his skull, causing brain injury and death. Any substantial risk of death, permanent disfigurement or impairment of bodily function was entirely attributable to Cody Rice, and no one has suggested that Ms. Rice had anything at all to do with the brutal killing of her son. The only supportable charge against her is that she did not treat the scalding in an “appropriate” manner. The evidence shows that she did what she thought best, that she treated the child at home with home remedies, “dermoblast,” vaseline, A&D ointment and pain medication. Any suffering sustained by reason of Ms. Rice’s not calling in professional medical care, if present at all, is minimal and certainly not of the kind that was life-threatening or threatening to cause serious and permanent *1324 impairment of bodily function. Although one witness believed that the scalding and the low body weight might have contributed to the child’s death, it is very clear that the child died as a result of skull fracture and brain injury inflicted by his father and completely unknown to the mother. If there be any crime committed here it is violation of NRS 200.508 without substantial bodily harm. At the very least, this conviction should be reduced to gross misdemeanor child neglect; but I must admit that this would be difficult to do in this case given the State's failure to charge the only crime that could possibly have been committed in this case.

 An even closer case than Fabritz is found in the reports of the Military Court of Appeals. In United States v. Robertson, 37 M.J. 432 (M.C. 1993), a general court martial conviction was reversed on the ground that a father who failed to obtain treatment for his son’s eating disorder, failed in proof because of lack of evidence that the father knew and appreciated the magnitude of the child’s symptoms. These cases merely confirm the obvious; we should not be sending people to prison for misjudgments and for merely failing to seek medical attention when they do not appreciate the magnitude of the risk in not doing so.

 It may be instructive to draw a parallel here to civil liability for punitive damages in cases of negligence or neglect. Ms. Rice’s conduct in this case would not warrant a punitive damage award, much less criminal conviction. Punitive damages were denied to the plaintiff in Village Development Co. v. Filice, 90 Nev. 305, 526 P.2d 83 (1974), a case in which there was evidence “to show negligence and unconscionable irresponsibility.” Id. at 315, 526 P.2d at 89. Even unconscionable irresponsibility does not constitute the “oppression, fraud or malice, express or implied,” necessary to establish the right to punitive damages. Id. at 315, 526 P.2d at 89 (quoting NRS 42.010). The concurring/dissenting opinion in Filice drew a parallel to Nevada *1327 Cement Co. v. Lemler, 89 Nev. 447, 514 P.2d 1180 (1973), in which the punitive damages were justified because “the defendant knew that if it continued to spew dust from its cement kiln that damage would ensue” and that it “did so not withstanding such knowledge.” Filice, 90 Nev. at 321, 526 P.2d at 93 (Thompson, C. J., dissenting in part). I would argue that the same kind of principle is involved here and that before punitive damages or criminal liability could result from Ms. Rice’s conduct, there had to be a charge and proof that “the defendant knew . . . that damage would ensue” and that she decided not to call a doctor “notwithstanding such knowledge.” Moral and criminal culpability presupposes a conscious disregard of a known risk. The jury should have been instructed along these lines.

 It is very difficult for me to understand how the jury could have possibly concluded that Ms. Rice acted voluntarily under these circumstances. She was faced with a sunburn-like scald on her baby’s back and a husband who threatened to kill her if she called the doctor. It is my opinion that, as a matter of law, the trial court’s definition of “willfully,” even if it were correct, would not apply to this case.

 In refusing to instruct the jury that “willfully” refers to some kind of guilty knowledge of the consequences of delay in treatment, the trial court apparently relied on Childers v. State, 100 Nev. 280, 680 P.2d 598 (1984), a pre-Martineau case that distinguished child neglect cases from all other criminal cases when it held that in such cases the mere act or omission created criminal liability and that “willfulness” as used in the statute referred to a “general intent,” thereby relieving the state from having to prove that the defendant “knew (or at least should have known)” of the consequences of delay. Martineau, 25 F.3d at 741. The Childers case, wrong on its face, can be safely ignored in the light of Martineau, which held that under these circumstances a parent “cannot be held criminally responsible for knowledge of medical risks which are neither readily apparent nor known to [them].” It can be argued, of course, that the pink, “sunburned” appearance of the baby’s back put Ms. Rice on notice that immediate medical attention was called for; but, the jury had no opportunity to discuss this issue, for all the jury had to do, under the instructions given by the court, to find Ms. Rice guilty was to conclude that the child was scalded and that Ms. Rice did not call the doctor. This is wrong on its face.

 By going for a felony in what at most is a gross misdemeanor case, the prosecution has presented a case with a missing element. The indictment charged that Ms. Rice’s negligence or neglect in failing “to seek appropriate medical treatment” “resulted] in substantial bodily harm.” The court defined “substantial bodily harm” as injury which creates a substantial risk of death or which causes serious permanent disfigurement or prolonged physical pain. It is obvious that all injuries to the boy which resulted in a substantial risk of death or caused serious permanent disfigurement were inflicted by Cody Rice. Ms. Rice was not charged with inflicting injuries upon her son. There is nothing to support a conclusion that she permitted her child to suffer substantial risk of death or permanent disfigurement. The only possible charge would be that Ms. Rice’s failure to call the doctor to attend to the child’s burns was the cause of prolonged suffering. Any prolonged suffering by this little boy was caused by his father who placed him in scalding water and then beat him to death. There is no evidence that any misjudgment on the part of Ms. Rice was the cause of any additional, much less prolonged, suffering by the child. There is no evidence that Ms. Rice caused “substantial bodily harm” to her son. In the absence of this evidence, the conviction should be set aside.

 Although, as said, my principal concern in this case is the court’s refusal to deal with Martineau and to define the required mental element of the crime of child neglect, it is quite apparent that the sentence was excessive in this case and should be reversed.
The following is the trial judge’s evaluation of Ms. Rice:
I don’t doubt a word of what all your friends and relatives and employers have said about you. By every single account from every source, you are a positive, productive, intelligent, able person. You’re a person with good judgment. You’re extremely industrious.
In striking contrast to most of the defendants who come before the Court, you don’t have any history of drug abuse, alcohol abuse, unemployment. You have a record every parent would hope for their child: an A student, a good employee, a participant in a program for gifted and talented students, a manager of other employees at a young age. In short, a model life.
I cannot even speculate as to why, if the judge believed what he said about Ms. Rice, he would have, contrary to the recommendation of the pre-sentence report, given Ms. Rice the maximum sentence of twenty years. She may have to serve as much time as her husband, the man who brutally beat her son to death in her absence.
Defense counsel contends that the judge based his decision to give Ms. Rice twenty years on inadmissible matters contained in the Cody Rice’s pre-sentence report. During argument, the prosecutor made reference to “Cody Rice’s PSI.” The sentencing judge made a number of statements during sentencing that support defense counsel’s belief that the judge improperly based his sentencing decision on matters contained in Cody Rice’s presen-tence report. The prosecutor made reference to “Cody Rice’s PSI” (presen-tence report); and the judge challenged Ms. Rice’s credibility based on material in Cody Rice’s presentence report — a report that was not available to defense counsel. Of most concern to me, however, is the judge’s “theory” that Ms. Rice was a murderer and that she may actually have collaborated in the killing of her son because she saw her son as “an obstacle to the flourishing of her life with her husband” and an “obstacle to the happiness in her life.” This theory, expressed by the sentencing judge, is absolutely incompatible with the evidence in this case. The judge himself saw his “theory” as being “as miserable a picture as one could imagine,” but went ahead to suggest that it may have been Ms. Rice’s mindset to say: “But suppose you take the son out of the picture . . . .” This idea that Ms. Rice murdered her son, to take him “out of the picture” because he was an obstacle to her happiness is so grotesque that it is difficult to understand why the sentencing judge would put such an outlandish thought on the record, or as he said, “put it out on the table.”
That the judge considered Ms. Rice to be a murderer is the only explanation of why he would sentence to twenty years in prison a woman who was charged with delaying the calling of a doctor to treat her son’s scalded back. What is most difficult to explain is how the judge could have believed that this mother was so cruel and unfeeling toward her own son as to kill him just because he was an “obstacle to [her] happiness.”
I am pleased to see that the majority agrees that the district judge relied on impermissible evidence during sentencing and concur in that judgment.