949 P.2d 262 (1997)
Christie Ann RICE, Appellant,
v.
The STATE of Nevada, Respondent.
No. 26111.
Supreme Court of Nevada.
November 20, 1997.
*263 Laura Wightman FitzSimmons, Las Vegas, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City, Richard A. Gammick, District Attorney, Terrence P. McCarthy, Deputy District Attorney, Reno, for Respondent.

OPINION
ROSE, Justice:
Christie Ann Rice (Christie) and her husband, Cody Alan Rice (Cody) first met in April of 1990. After learning that she was carrying his child, she moved in with him, and they were subsequently married. However, the marriage was strained because Cody was violent and abusive toward Christie. Matthew, Christie and Cody's son, was born on July 1, 1992. Sometime around the middle of September 1992, Cody told Christie *264 that Matthew had been accidentally burned in hot water. Christie tried to treat Matthew's injuries at home. On September 22, 1992, Matthew was rushed to the hospital because he had stopped breathing. He died in the hospital two days later.
Cody was charged with and pleaded guilty to the first degree murder of Matthew. He was sentenced to life imprisonment without the possibility of parole. Christie was charged with child neglect causing substantial bodily harm to Matthew. Following a jury trial, Christie was convicted and sentenced to serve the maximum term in prison allowed by law, twenty years. Christie now appeals. We affirm the conviction but remand for resentencing.

FACTS
In April of 1990, Christie met Cody, and they were engaged in August of 1991. Christie moved in with Cody in January of 1992 when she found out she was pregnant with Matthew, and the two were married in April of 1992. Christie testified that until she moved in with Cody, the two never had any problems.
Christie stated that shortly after they moved in together, Cody became physically abusive toward her. However, she did not leave because she loved Cody and believed he would not continue to hurt her because he loved her. Christie's family and friends also testified to Cody's violent, threatening, and explosive behavior toward Christie.
Matthew was born on July 1, 1992. Despite Cody's abusive and controlling behavior toward her, Christie testified that she believed he would not hurt Matthew because he was so proud to be a father. Christie testified she could never imagine Cody intentionally hurting Matthew.
On August 21, 1992, Dr. Berkley Powell, a physician in Reno, saw Matthew. Dr. Powell testified that Matthew had a fever, a yellowish, bloody discharge coming from his nose, and was breathing very rapidly. Matthew had also thrown up blood the night before. Matthew was admitted to the hospital and was diagnosed with pneumonia, and he remained in the hospital for approximately a week. During his stay in the hospital, Matthew recovered from the infection but lost almost half a pound.
Dr. Powell also noticed a bruise above Matthew's nose and his eye. When he asked Christie about it, she said Cody had dropped Matthew, and Matthew's face had struck a coffee table. Dr. Powell's concern prompted him to order a CAT scan and X-rays and call child protective services. The X-rays did not reveal any indications of fractures. Dr. Powell testified that Christie seemed uncomfortable with the questions he asked about Matthew's injuries, and he believed she was covering up for Cody.
Child abuse was suspected, and a social worker from Washoe County Child Protective Services was assigned to Matthew's case. The social worker testified that Cody related several inconsistent accounts about Matthew's injuries. Based on twenty-two different factors, the social worker rated the risk of injury to Matthew as low, despite information he received from a family member that Cody had a quick temper.
After Matthew was released from the hospital, Christie got a job because Cody was not working regularly. When Christie was at work, Matthew was in the care of either Cody or Christie's grandparents. Christie testified that Cody became "very explosive," volatile, and short-tempered during this time. He quit his job and did not tell Christie. Christie related an incident in which Cody threatened her with a knife, telling her he was going to kill them both so that they would die as a family and nobody could control them any longer. Christie stated that when Cody realized she was holding Matthew, he backed off. She stated she was terrified of Cody by this point.
On September 17, 1992, Cody went to see Christie while she was at work. He told her Matthew had been burned when Cody had been giving Matthew a bath and failed to check the water temperature. Christie could not remember the exact date this incident had happened. Cody told Christie the burns were not bad, just pinkish. Christie told Cody to go home and stay with Matthew. When Christie got home, she looked at Matthew's burns. She testified they were "pink *265 like a sunburn" and reddish in some areas. She bathed Matthew, put ointment on his burns, and dressed them in gauze.
Christie told Cody she thought a doctor should see Matthew, but Cody told her no. Cody told her they could treat Matthew's wounds themselves, and if he got worse, then they would take him to a doctor. Christie acquiesced to Cody's demands because she was afraid of what Cody would do to her if she did not, especially because Cody had previously threatened to kill them all. Christie was also worried that social services would take Matthew from her.
On September 18, 1992, a friend of Christie's and Cody's, Lori Smith, visited Cody and Matthew while Christie was at work. Lori saw Matthew lying on his stomach with gauze covering his back and upper arms. She saw no blisters or oozing around the gauze covered area, but noted that when Cody turned Matthew over to change his diaper, he started crying. She asked Cody what happened, and he told her Matthew had been in the bath when the water suddenly got hot and burned him. Lori thought the burns looked bad, so she asked Cody if Matthew had been to the hospital, and Cody replied that he had.
In the early evening of September 22, 1992, Matthew was having trouble breathing. Christie stated that she told Cody she was going to take Matthew to the doctor the next day, and Cody became enraged. The next day at work, Cody called Christie and told her that there was an emergency with Matthew. When Christie got home, Cody was performing CPR on Matthew. They drove Matthew to the hospital.
Christie and Cody arrived with Matthew at the emergency room of Saint Mary's Hospital shortly before 5:00 p.m. on September 22, 1992. Shari Quinn, a nurse at the emergency room of Saint Mary's, testified that when Matthew arrived at the hospital, he had no heart or respiratory rate and was subsequently put on life support. Quinn questioned Christie and Cody about the events leading to Matthew's injuries. Quinn testified that Christie told her Matthew had been burned four or five days earlier when the water heater had exploded. Quinn re-entered the emergency room and while moving Matthew, felt fluid from the burn on his back. She stated that when she pulled her hand away from Matthew, her hand had sanguinous fluid and dead skin from the burn on it. She rolled Matthew over and saw a huge burn over most of his back.
Another nurse who treated Matthew assumed when she saw him that he was only four to five weeks old because his weight was so low. Matthew's injuries included a black eye and a small cut under it, noticeable abrasions on his ear and head, burn marks on his hand, a blister on one of his feet, and a large burn on his back covering the majority of the area between his shoulders and buttocks. The burn on Matthew's back was open and cracked, moist and oozing, with the skin flaking away. No ointment or other kind of medical treatment was evident on Matthew at the time he was admitted. Additionally, evidence was presented that Matthew had suffered "tissue wasting" and "muscle wasting," as evidenced by his buttocks and legs having no plumpness and being almost "to bone."
Matthew was transferred from Saint Mary's to Washoe Medical Center for further treatment, but died on September 24, 1992. The autopsy revealed that in addition to the burns, Matthew had suffered injuries not superficially apparent. These included broken ribs and a severe cranial trauma. Additionally, Matthew's thymus gland had withered. The stated cause of death was blunt injuries to the skull and brain, in combination with the burn wound.
Detective Jenkins, a Reno Police detective, was called in by the medical team, and he interviewed Christie. Christie never told him she was afraid of or abused by Cody; however, she did tell Jenkins she had seen Cody very angry on occasions. She also told Jenkins she felt the need to protect her husband and her child and said she had never seen Cody hurt Matthew. Jenkins concluded that Christie, three years older than Cody, was clearly the more mature one and did not seem intimidated by him. In fact, Christie stated that she would leave *266 Cody immediately if he was physically abusive to Matthew or her.
Christie also told Jenkins that Matthew had been burned in the shower with Cody. However, detectives found that the various faucets in Cody's and Christie's apartment maintained a consistent temperature, not over 135 degrees. Additionally, testimony was presented which indicated Matthew would have had to have been immersed in water that temperature for nearly one minute to suffer the burns found on him.
Christie initially characterized Matthew's burns as pinkish in color with no blistering or other indication of a severe burn. Later in the interview, she told Jenkins that Matthew's blanket was sticking to his burns and that when she removed the blanket, portions of his skin would "literally peel off with the blanket." She also indicated that the blistering had occurred shortly after the burn trauma.
Following the investigation of Matthew's death, Cody was charged with first degree murder. Prior to trial, Cody pleaded guilty to this charge and was sentenced to life without the possibility of parole. On October 28, 1992, an indictment was filed alleging that Christie had committed the offense of child neglect causing substantial bodily harm. The State alleged that Christie had caused Matthew to suffer unjustifiable physical pain when she "neglected, delayed or refused to seek appropriate medical treatment for [Matthew's] malnourishment and failure to thrive and for second degree burns [Matthew] received while under the care of [Christie] and/or CODY A. RICE." The State's theory was that Christie did not seek treatment for Matthew's burns because she was afraid social services would take Matthew away from her. Christie was only charged with neglecting Matthew for the period between September 14 and September 22, 1992.
Prior to trial, Christie was evaluated by Dr. Lon Kepit, a clinical psychologist specializing in cases involving battered women. Kepit concluded that Christie's behavior fit the model of a battered woman. Dr. Kepit testified that as a battered woman, Christie would lose sight of her personal boundaries. She would also, therefore, lose sight of boundaries for Matthew and be unable to assess danger accurately.
Following a jury trial, Christie was convicted of child neglect causing substantial bodily harm. The district court sentenced Christie to twenty years in prison.

DISCUSSION

The district court properly instructed the jury concerning the definition of "willfully" as used in NRS 200.508
In Childers v. State, 100 Nev. 280, 680 P.2d 598 (1984), we considered the propriety of giving an instruction defining the word "willfully" as was given in this case.[1] We concluded that the definition was proper to describe the intent needed for the general intent crime of child abuse/neglect.
The instruction was proper. The child abuse statute is a general intent crime. The word "willfully" must be defined in that context. The California courts have long approved the use of this definition of "willfully," which is taken from the California Penal Code Section 7(1). See, e.g., People v. Atkins [53 Cal.App.3d 348] 125 Cal.Rptr. 855, 861 (Cal.App.1975) (approves use under child abuse statute, California Penal Code Section 273d).
(Footnote omitted.) In Smith v. State, 112 Nev. 1269, 927 P.2d 14 (1996), we recently upheld a child abuse and neglect conviction based on NRS 200.508 and held that this statute was not unconstitutionally vague. Child neglect is a general intent crime, and the definition of "willfully" has been approved several times in Nevada and elsewhere. We find no error in its use in this case.

*267 The evidence adduced at trial was sufficient to sustain the conviction

For this court to affirm a conviction, sufficient evidence must be presented to establish the essential elements of each offense beyond a reasonable doubt as determined by a rational trier of fact. Sanders v. State, 110 Nev. 434, 436, 874 P.2d 1239, 1240 (1994). The Ninth Circuit Court of Appeals has stated what evidence is needed to prove child abuse based on delay in seeking medical treatment, and the analysis would be the same for child neglect. Martineau v. Angelone, 25 F.3d 734 (9th Cir.1994). Martineau states:
Appellants contend, and the state concedes, that under the Nevada Supreme Court's ruling, the child abuse conviction can be upheld only if the state proved beyond a reasonable doubt that appellants committed an "omission"i.e. that they "willfully caused or permitted" [the child] to suffer unjustifiable physical pain by delaying in seeking medical care. NRS 200.508 (1977). Appellants argue that even "reviewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found proof of [delay] beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We agree.
In order to prove child abuse based on delay, the state had to prove both (A) that some time passed between [the child's] injuries and appellants' 911 call and attempted CPR and (B) that, during this time, appellants knew (or should have known) that [the child's] injuries were serious enough to require immediate medical attention, yet did nothing.
Id. at 739 (citing Fabritz v. Traurig, 583 F.2d 697 (4th Cir.1978)).
Christie's defense was that when she noticed the burns, she was going to take the infant to the hospital until Cody objected and said that social services would be called and would take the child from them. Concerned about losing her child and Cody's propensity for violence, she decided that medical assistance was not essential and that she could care for the baby at home. The dissent claims, that at the worst, Christie is guilty of "bad judgment." However, there is ample evidence from which a jury could conclude that there were observable injuries during the week prior to Matthew's hospitalization that needed medical attention and that the child suffered substantial pain and injury because of the delay in obtaining such care.
Dr. Ellen Clark, the pathologist who observed the child at the hospital for one and one-half days prior to his death and who conducted the autopsy, stated: "It's my opinion that Matthew Rice was a victim of child abuse which extended over several episodes, certainly from August through his death." Dr. Clark testified that the child lost a substantial amount of weight from his first hospitalization on August 22 until his second hospitalization on September 22, and that it was readily observable that he was malnourished and extremely underweight. She explained that his weight at the August hospitalization was in the ten to twenty-five percentile of children two months old, but that when he was admitted on September 22, his weight was below the fifth percentile of children three months old. She did acknowledge that some weight loss could have been attributable to the continuing pneumonia Matthew had that caused the August hospitalization.
Dr. Clark testified that the child had second degree burns from his neck down to the upper part of his buttocks and stated that: "A second degree burn goes deeper into the skin and is characterized by damage to the skin. It's in the form of blistering, and very often skin sloughage or peeling of the skin." The burns involved approximately twenty-five to thirty percent of the total body surface area, and Dr. Clark stated that burns over this extent of an infant's body are extremely serious and cause a great risk of dehydration and infection without proper medical treatment. Another complication of the burn was that it would be a painful injury, and "it would have disturbed the baby's normal daily functions, including sleeping and eating."
Christie testified that the burn wound was just pinkish for the four or five days Matthew *268 was at home. While she wanted to take the infant to the hospital, she discerned no emergency medical situation. However, this was refuted by several health professionals and Lori Smith, the couple's teenage friend. Nurse Quinn testified that upon admission, Matthew's burn wounds were open and secreting sanguinous fluid. Drs. Clark and Bonaldi testified that the blistering would have been observable shortly after the injury and that immediate medical assistance should have been sought. Describing how the second degree burn wound would look during the four days after the injury, Dr. Bonaldi stated:
[T]he first day would be very red, lots of blisters. Blisters would begin to rupture the first couple, three days. Then depending on how the burn is treated, those blisters will stick to the skin and further weep. If the blisters are removed this would begin some type of granulation or healing phase by three to four days.
Christie admitted that the blistering occurred shortly after the burn and that the blanket was sticking to Matthew's open wounds. Lori Smith stated that the burns looked bad shortly after they had been sustained. When she inquired about seeking medical treatment, Cody lied about having taken the baby to the hospital.
The jury easily could have concluded that from the time the baby was burned four or five days prior to the hospital admission, he was in desperate need of medical assistance for the serious burns and what Dr. Clark described upon admission as his severe malnutrition and "wasted appearance." Not only could the jurors conclude, from the expert testimony and their own life experiences, that these physical injuries necessitated immediate medical care, but that the pain and disruption in the infant's eating and sleeping habits could not have been overlooked by any reasonable person. As to Christie's assertion that she was afraid of Cody and the possible loss of her child if medical assistance was sought, the jury could have discounted this testimony or believed that Christie has an overriding responsibility to the infant in spite of these possible consequences.
There was more than ample evidence to establish that Christie knew or should have known that the infant was in need of medical care, that she unreasonably delayed in providing it to him, and that the delay caused the infant to suffer unjustifiable physical pain or mental suffering. Therefore, the evidentiary concerns of the Martineau decision were met.

The district court did not err in failing to instruct the jury on the lesser degree of child neglect
NRS 200.508 provides that anyone who willfully causes a child to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect is guilty of a gross misdemeanor. But if substantial bodily or mental harm results, the perpetrator is guilty of a felony. The statutory definition of substantial bodily harm set forth in NRS 0.060 states that it is bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or prolonged physical pain.
The indictment charged Christie with causing Matthew to suffer unjustifiable physical and/or mental suffering resulting in substantial bodily harm to the child, a felony. At the trial's conclusion, the jury was instructed on the felony charge, but the lesser included offense of gross misdemeanor child neglect was not included in the instructions nor was it requested by the defense. Christie now claims that the district judge had an obligation to instruct the jury on the lesser included offense notwithstanding her failure to request such an instruction.
In Davis v. State, 110 Nev. 1107, 1114, 881 P.2d 657 (1994), we held that a district court need not instruct the jury on a lesser included offense if evidence clearly showed guilt above the lesser offense. In this case, we believe the State introduced sufficient evidence to establish that Christie's four or five day delay in seeking medical treatment resulted in Matthew sustaining prolonged physical pain, thereby falling within the definition of substantial bodily harm. Expert testimony established that the massive burn was extremely painful and a jury *269 could conclude that delaying treatment for four or five days unjustifiably prolonged that pain. Therefore, it was not error to omit giving an instruction on the lesser included offense of gross misdemeanor child neglect.

The district court did not err in permitting evidence of the cause of Matthew's death and then instructing the jury on the limited use of this evidence
Christie argues the State improperly introduced evidence of the cause of Matthew's death. Prior to trial, the defense filed a motion in limine seeking exclusion of evidence concerning Matthew's cause of death and injuries that became evident to medical personnel following his admission to the hospital. The defense requested this motion in limine because it was concerned about the prejudice to Christie if evidence was admitted regarding the non-visible injuries as contributing factors to Matthew's death. The defense claimed Christie would essentially be forced to defend herself against allegations of murder, when she was only charged with neglect, based on her knowledge of the bruising on Matthew's face upon his admission to the hospital for pneumonia and his burns days prior to his death.
In a pre-trial ruling, the district judge decided to limit testimony regarding the extent of Matthew's injuries, beyond those specifically referred to in the indictment, the failure to thrive and the second degree burns. The district judge then decided to admit evidence of the cause of Matthew's death only after the State's expert witness, Dr. Clark, testified at length on the subject outside the jury's presence. Judge Adams noted that the court would give strong cautionary instructions to the jury to the effect that Christie was not on trial for the acts Cody committed on Matthew.
A pretrial order granting a motion in limine may be modified or reversed at trial. To preserve the issue for appeal, however, the objection must be renewed at trial when the evidence previously ruled inadmissible by the order in limine is offered in evidence. Staude v. State, 112 Nev. 1, 5, 908 P.2d 1373, 1376 (1996). During its opening argument, the State made comments regarding Matthew's injuries discovered by medical personnel upon Matthew's admission to the hospital. However, the defense did not object to these statements. Therefore, the defense waived its right to complain about these comments on appeal.
On the second day of trial, the district court held a hearing outside the presence of the jury to determine what parts of Dr. Clark's testimony would be admitted. The district court allowed Dr. Clark to testify to the full extent of the injuries she observed on Matthew during the two days she treated him prior to his being removed from life support. This included the blistered second degree burns and cranial injuries. Prior to Dr. Clark's testimony, the district judge admonished the jury that Christie was not "charged with causing the death of Matthew..., nor ... with administering any of the injuries which Dr. Clark will discuss in her testimony." At this point, the defense neither objected to this instruction nor proposed an alternative instruction.
Generally, the failure of a party to propose a limiting instruction bars raising this issue on appeal. Richardson v. State, 91 Nev. 266, 534 P.2d 913 (1975). In Levi v. State, 95 Nev. 746, 749, 602 P.2d 189, 190-91 (1979), this court stated:
Only in exceptional circumstances need the trial court, sua sponte, give such a limiting instruction. For example, in Champion v. State, 87 Nev. 542, 490 P.2d 1056 (1971), the state conceded that a cautionary instruction concerning an addict-informer's testimony was central to the cause, and we found prejudice where no such instruction was given.
In this case, the district court provided the jury with a cautionary instruction with no objection by the defense. Therefore, we conclude the district court did not commit error in instructing the jury as it did.

The prosecutor did not engage in misconduct
District courts have a duty to ensure an accused receives a fair trial and must therefore control obvious prosecutorial misconduct sua sponte. Collier v. State, 101 Nev. 473, 477, 705 P.2d 1126, 1128 (1985). *270 "A prosecutor may not argue facts or inferences not supported by the evidence." Williams v. State, 103 Nev. 106, 110, 734 P.2d 700, 703 (1987).
Christie alleges the prosecutor committed several instances of misconduct in his opening and closing argument to the jury. In his opening argument, the prosecutor stated:
Ms. Quinn went to pick up the infant, who was clad in only a diaper, she placed one hand under his head and the other hand under his lower back. Ladies and gentleman, at that time, even with all her years of experience as a nurse, she felt something so unusual that she had never felt before. She immediately withdrew her hand, and on her hand was skin from infant Matthew Rice because of burns on his back that were so severe, the skin was literally just coming off.
She actually became traumatized herself from this. She went and she washed her hands. She just kept rubbing and rubbing and washing and washing, because it disgusted her so much.
Christie asserts this statement constituted misconduct because Ms. Quinn never testified that she reacted in such a manner to Matthew's burns. At trial, Quinn testified she was "extremely shocked" and "stunned." After showing the doctor Matthew's burned back, she "stepped back out of the picture... and just basically got [her] thoughts together."
Generally, the prosecution has a duty to refrain from making statements in opening arguments that cannot be proved at trial. Riley v. State, 107 Nev. 205, 212, 808 P.2d 551, 555 (1991). "It is proper for the prosecutor to outline his theory of the case and to propose those facts he intends to prove." Garner v. State, 78 Nev. 366, 371, 374 P.2d 525, 528 (1962). Even if the prosecutor overstates in his opening statement what he is later able to prove at trial, misconduct does not lie unless the prosecutor makes these statements in bad faith. Id. Although Quinn's testimony at trial was not exactly what the State promised, nothing in the record indicates the State's statements were made in bad faith.
In his closing argument to the jury, the prosecutor stated: "Christie Rice, at the age of 22, chose to bring a life, to bring a child into this world. A healthy, beautiful little boy named Matthew was born on July 1st, 1992. `Matthew' means a gift from the Lord." The defense objection to the relevancy of this statement was overruled.
The prosecutor also stated in closing that:
Anybody who has even scorched themselves with the tip of an iron on your finger or your hand knows the extent of the pain of a burn over several days.
When the life, not just the pain from the burn but the life of an innocent, defenseless child is at stake, is it even conceivable that the mother of that child would neglect that child's life-threatening injuries because of anything the husband could possibly be threatening her with?
....
Are we willing to accept this as a defense for the failure to protect such a child? ....
....
And, ladies and gentleman, of course it goes almost without saying that if your baby is suffering from life-threatening dehydration or the possibility of infection, that you must take all steps to prevent not only that from occurring, but that from getting worse. To knowingly permit any of these risks is unconscionable....
Christie also objects to a later statement in the prosecution's argument: "No one of us or anyone we can think of would have acted the same and expected their conduct to be excused, to allow this child to suffer." At that point, the defense objected because the prosecution was misstating the law. The court reminded the jury that the statements of the prosecutor were not statements of law but merely argument.
In Williams v. State, 103 Nev. 106, 109, 734 P.2d 700, 702 (1987), this court concluded that it is improper for the prosecutor to place the jury in the position of the victim. However, in this case, the prosecutor was asking the jurors what they would do if placed in the defendant's positionnot the *271 victim's. Since the defendant's state of mind and action were the primary issue and the statements had substantial support in the evidence presented, this argument was not improper and did not prejudice the overall fairness of the trial.
Finally, Christie objects to the prosecution's statement to the jury that: "Concededly, the State has not opted to attempt to prove that [Christie] committed any of the abuse by direct physical action, but she is guilty of neglect of this child." Christie complains that this argument "clearly implied that the state could have charged Christie with actually directly abusing Matthew, but chose not to." We conclude the defense's interpretation of this statement is extreme. Christie suffered no prejudice as a result of the statement, and any possible error that resulted was harmless. Ross v. State, 106 Nev. 924, 928, 803 P.2d 1104, 1106 (1990). The argument was relevant to explain what the State had charged and was obligated to prove.

The district court erroneously sentenced appellant by relying on impermissible evidence
The defense called Nancy Clark, a professional who provided an alternate sentencing report based on interviews with people involved in the case. The district judge asked Clark approximately 100 questions, many of which concerned information the judge obtained from presiding over the criminal proceedings involving Cody Rice or from reading Cody's presentence report. Christie asserts this conduct indicates that in sentencing Christie, the district court judge improperly relied upon information never provided to the defense. In particular, Christie complains about the district judge's professed disbelief that Christie was unaware of Cody's drug and alcohol abuse.
NRS 176.156(1) governs the disclosure of presentence reports and states: "The court shall disclose to the district attorney, the counsel for the defendant and the defendant the factual content of the report of the presentence investigation and the recommendations of the division and afford an opportunity to each party to object to factual errors and comment on the recommendations." In Shields v. State, 97 Nev. 472, 634 P.2d 468 (1981), this court concluded that the trial court's failure to provide the defense counsel with police reports which were contained in the presentence report violated NRS 176.156 and deprived the defendant of due process. This due process violation was highlighted by the fact that "the district judge's sentencing decision manifestly was affected by information contained in the reports." Id. at 473, 634 P.2d at 469.
In this case, the district judge spent quite a bit of time questioning Clark about the credibility of Christie's professed unawareness of Cody's drug and alcohol use. In his questioning of Ms. Clark, it was apparent that the judge was relying on the information furnished by Cody in his presentencing report and sentencing hearing. Repeatedly, the district judge asked how Christie could not have known of Cody's alcohol and drug abuse when Cody's habit and conduct as described by him would have been obvious to anyone. In effect, the judge was accepting Cody's statements of continual and excessive drug use as true and asking Clark to square Christie's professed lack of knowledge of Cody's drug problem with such statements. This was part of the larger inquiry the district judge was making about whether Christie had lied when she testified.
A judge should always disclose information he has received from third parties concerning the sentencing of a defendant. Todd v. State, 113 Nev. 18, 931 P.2d 721 (1997). And if it appears from the record that the judge used such material or relied on it, the use of the information is deemed prejudicial if not divulged to the defendant. Id. at 26, 931 P.2d at 726; see also U.S. v. Copeland, 902 F.2d 1046 (2d Cir.1990) (defendant entitled to opportunity to respond to information considered by sentencing court); U.S. v. DeVore, 839 F.2d 1330 (8th Cir.1988) (court permitted defendant to review co-defendant's presentence investigation containing codefendant's version of the robbery). There is no evidence in the record that the defense was provided with a copy of Cody's presentence report or that Christie's attorney stipulated to its use at Christie's sentencing.
*272 The district judge's perception of Christie's veracity was critical. Christie called numerous witnesses at the sentencing hearing who portrayed her as a responsible young adult who had no prior criminal record of any type and would almost certainly do well on probation. The district judge admitted as much.
I don't doubt a word of what all your friends and relatives and employers have said about you. By every single account from every source, you are a positive, productive, intelligent, able person. You're a person with good judgment. You're extremely industrious.
In striking contrast to most of the defendants who come before the Court, you don't have any history of drug abuse, alcohol abuse, unemployment. You have a record every parent would hope for their child: an A student, a good employee, a participant in a program for gifted and talented students, a manager of other employees at a young age. In short, a model life.
In viewing Christie's positive life before the birth of her child and the criminal neglect of which she was convicted, the district judge posed the following two extremes: "Either she shouldn't be in prison or [on] probation, just congratulate her for being a nice person and go home, or she should be punished very severely." The judge later speculated that perhaps Christie knowingly let her child be severely abused by Cody to "take [the child] out of the picture" and remove the "obstacle to the flourishing of her life with her husband." The judge's opinion of Christie's credibility did in large measure determine whether she received the lightest or the most severe sentence.
In accepting Cody's statements in the presentence report and using them in a critical analysis of whether Christie had fabricated her testimony, the judge apparently came to the conclusion that Christie had lied and that she was partly responsible for the child's death. Cody's presentence report was just as important to Christie as was the police report in the Shields case, and perhaps more so. The prosecutor even referred to Cody's presentence report in his closing argument. Therefore, we believe that since the district court's use and reliance upon Cody's presentence report without providing the defense with a copy constituted prejudicial error, we are compelled to reverse the sentence in this case and remand for resentencing. To eliminate any problem with what the sentencing judge may remember from the sentencing of Cody, the resentencing shall be conducted by another district court judge. Since we conclude that the use of Cody's presentence report requires us to reverse this sentence, it is not necessary to consider Christie's remaining claims of error committed at sentencing.

CONCLUSION
First, we conclude that sufficient evidence existed to sustain Christie's conviction for felony child neglect. Second, we conclude that because Christie failed to request an instruction on the lesser offense of gross misdemeanor child neglect, the district court did not err in failing sua sponte to instruct the jury on this lesser offense. Third, we conclude that the use of evidence of the cause of Matthew's death was properly restricted by the instruction given to the jury. Fourth, the prosecutor did not engage in misconduct in the opening and closing arguments. However, we also conclude that the district court relied on impermissible evidence in sentencing Christie. Accordingly, we affirm the conviction of child neglect, but reverse the sentence imposed and remand to the district court for sentencing by another district judge.[2]
SHEARING, C.J., and YOUNG, J., concur.
SPRINGER, J., concurring in part and dissenting in part:
I concur with remanding this matter for resentencing, but I dissent to the remaining judgment of this court because there are two errors in this case that require reversal.
The most obvious error is the trial court's failure to instruct the jury on the lesser *273 degree of the crime of child neglect. Child neglect is a gross misdemeanor unless there is proof of "substantial bodily or mental harm." Proof of the added element of substantial bodily or mental harm raises the crime of child neglect from a gross misdemeanor to a felony calling for a maximum of twenty years in prison.
NRS 175.201[1] requires not only that a jury must be instructed on the degrees of an offense, it also requires that the jury be instructed that if there is a reasonable doubt as to which degree is proven, the defendant is to be convicted of the lowest degree. Ms. Rice was denied the benefit of this statute. See Lisby v. State, 82 Nev. 183, 414 P.2d 592 (1966).
Although I believe that it was error per se for the trial court not to instruct on the lesser offense, I would point out that the omission was particularly disastrous to this defendant because this case looks much more like a gross misdemeanor case than a felony case, and the jury should have had the chance to bring in a verdict of the lesser offense.
The jury was not given a chance to decide that injuries suffered by reason of delay in seeking medical attention were less than "substantial," which is to say, injuries which created a substantial risk of death, loss or impairment of the function of a bodily organ or member, or prolonged physical pain. NRS 200.060. As I will demonstrate, proof relating to "substantial" injury in this case must be related to the scald injury and the scald injury alone. It is very difficult to conclude that Ms. Rice's deciding not to call in professional medical care until the scalding reached the blister stage resulted in "substantial" injury, as defined by NRS 200.060. I find no evidence in the record that this delay was the cause of any increased or unnecessary suffering on the part of the child. The intentional scalding inflicted by the child's father was what caused the child's injuries, not Ms. Rice's delay in calling the doctor. The evidence in this case certainly would support a jury finding that Ms. Rice's delay in getting medical treatment for the scalding did not result in any appreciable detriment to the child and that it could not possibly have resulted in injury of a "substantial magnituderisk of death, loss of a bodily organ or prolonged physical pain." It is safe to say, given the circumstances of this case, that if Ms. Rice were guilty of child neglect at all, she would be guilty of gross misdemeanor child neglect and not felony child neglect. That the jury did not have the opportunity to convict Ms. Rice of the lesser degree of child neglect is so prejudicial as to call clearly for the reversal of her felony child neglect conviction.
Apart from the obvious error present in the trial court's failing to instruct on the lesser degree of child neglect, a momentous error has been committed in this case. This error, which has been ignored by this court, threatens to put in jeopardy future child neglect convictions, convictions which, like the conviction in this case, will be judged by federal judicial authority to be in violation of the federal constitution and in direct contravention of federal cases in point. The error to which I refer is the failure of the trial court to define and instruct properly on the mental element of the crime of child neglect, the mens rea.
Mens rea, sometimes referred to in terms of "guilty mind," "consciousness of criminality" or "wrongful purpose" is a necessary element of any crime. Ms. Rice cannot be guilty of a crime simply because she exercised bad judgment in not calling in medical attention for her child's scald injury; yet that is what this case is all about.
As I will maintain throughout this opinion, Ms. Rice cannot be guilty of a crime unless she knew or should have known that a delay in calling a doctor was going to cause unjustifiable *274 injury to her son.[2] As matters stand, Ms. Rice was incorrectly convicted of a crime when, at most, she was guilty of negligence. The indictment charged that Ms. Rice "neglected... to seek appropriate [reasonable and proper] medical treatment." The court instructed the jury (Instruction No. 15) that "`neglect' includes negligent treatment" and the "negligent ... care, control and supervision or lacks the subsistence, medical care or other care necessary for the well-being of the child." This is a negligence case. We must bear in mind that the difference between mere negligence and criminal misconduct is that in a negligence case the actor is held civilly liable for failure to perceive danger; whereas, in criminal cases the actor is held criminally liable for being aware of an impermissible risk and acting in spite of the danger. There is no charge, nor is there evidence to support a charge, that Ms. Rice knew of a danger and that she knowingly disregarded a known danger.
When Ms. Rice tried to take the case out of the negligence realm and into the criminal by asking for an instruction defining the word "willfully" in terms of a deliberate and knowing omission as distinguished from mere inadvertence or negligence, the trial court refused the request and, instead, defined "willfully" in terms of a mere "willingness to commit the act." Under the court's instruction, Ms. Rice could be held criminally liable just for failing to perceive a danger in not calling for immediate medical attention, without regard to her knowledge of the danger that might be inherent in the delay. This, then, is a negligence case, not a criminal case. Ms. Rice has gone to prison for twenty years for negligence. This is a violation of Ms. Rice's due process rights under the Fourteenth Amendment of the Constitution of the United States.
Not long ago the Ninth Circuit Court of Appeals invalidated a Nevada criminal conviction for child neglect because "[n]either the Nevada Supreme Court opinion nor Nevada case law clearly states the precise mental state required [for a conviction of child neglect]." Martineau v. Angelone, 25 F.3d 734, 739 n. 10 (9th Cir.1994). The federal appeals court made it very clear to us that in order to convict for child neglect the state must define the mental state required for conviction. It has told us that there must be something more than mere parental negligence and told us that there had to be proof of guilty knowledge or scienter on the part of a parent before a parent could be held "criminally responsible."
In Martineau, a case very much like the one now before us, the Ninth Circuit held that in cases of delayed medical treatment, parents " `cannot be held criminally responsible for knowledge of medical risks which are neither readily apparent nor known to [them].' " Id. at 741 (quoting United States v. Robertson, 37 M.J. 432, 440 (C.M.A.1993) *275 (Glerke, J., concurring)). As was the case at the time of Martineau, presently, in this state, neither state statute nor case law defines the mental state required for a conviction of child neglect; and until such definition is provided, we will continue to face federal intervention under the constitutional principles which are announced in Martineau. The superficial opinion which accompanies the affirmance of this conviction invites another federal habeas corpus writ by reason of the clear violation of Ms. Rice's federal right to due process of law that results from punishing her criminally for mere negligence and in the absence of the universal requirement for criminal liability, mens rea, criminal intent.
Ms. Rice was charged with a violation of NRS 200.508. This statute, in addition to dividing child neglect into two separate crimes, one a gross misdemeanor, the other a felony, defines the offense in terms of two different kinds of conduct. One crime is committed (under NRS 200.508(1)(a)) by a person who actively "causes a child" to suffer unjustifiable pain; the other crime is committed (under NRS 200.508(1)(b)) by a person who passively "permits or allows" a child to suffer unjustifiable pain or to be placed in a situation where the child "may suffer" pain. Such an omission must, however, as I have said, be made with " `knowledge of [the] medical risks.' " Martineau, 25 F.3d at 741 (quoting Robertson, 37 M.J. at 440 (Glerke, J. concurring)).
Although the indictment charges that during a one-week period (September 14-22, 1992) Ms. Rice "caused or permitted the victim to suffer unjustifiable" pain, there is no allegation or proof that would indicate any culpable conduct on the part of Ms. Rice during this period other than that she negligently "permitted" her son to suffer injury because she "neglected, delayed or refused to seek appropriate medical care."
It should be noted early on that Ms. Rice is not charged with having "permitted" the child's father to kill the child by inflicting upon the child fatal blunt injuries to the skull and brain. The State does not blame Ms. Rice for negligently permitting the child's father to beat the child to death; the State charged and attempted to prove only that Ms. Rice neglected "to seek appropriate medical treatment" for three kinds of injuries, namely, (1) malnourishment, (2) failure to thrive and (3) "second degree burns the child received while under the care of the defendant and/or CODY A. RICE."
It is important to note that it is readily apparent from a reading of this record there was no attempt to prove that Ms. Rice neglected to seek appropriate medical care to treat the child's malnourishment. It is clear from the record that the child suffered malnourishment, but only as a result of a bout with pneumonia and the child's hospitalization for this disease. The child lost weight while in the hospital, and after recovering from his pneumonia had trouble digesting his food because of mucus that remained in his stomach as a sequela to the pneumonia. The record shows that the child had difficulty in gaining weight after his illness and that a district health nurse, Jeanette O'Brien, made a home visit during this time and talked to Ms. Rice about the child's nutritional problems. The nurse observed that Ms. Rice "was very good with the baby" and "very loving and attentive to infant's needs." There is certainly no evidence during the one-week period charged in the indictment that Ms. Rice neglected to get appropriate medical attention for the malnutrition.
With regard to the charged "failure to thrive," there is no evidence in the record as to what this term might mean. One of the testifying physicians, Dr. Clark, testified that he was not qualified to give an opinion as to whether the child had "failed to thrive." The other testifying physician, Dr. Powell, did not testify that the child failed to thrive. Failure to thrive is a problematical diagnosis, and it is very difficult to trace its etiology. There is no evidence that any neglect on Ms. Rice's *276 part in seeking "appropriate medical treatment," brought about the "failure to thrive" syndrome, much less evidence that such neglect caused "substantial bodily or mental harm" to the child. The only possible "unjustifiable" pain that Ms. Rice may have "permitted" her child to suffer was that connected with the "second degree[[3]] burns" the child received.
The scalding in question was intentionally inflicted upon the child by the murderer, Cody Rice. Cody Rice told Ms. Rice that the child had been accidentally scalded while he was giving the child a bath. When Ms. Rice got home from work that evening, she expressed her concern about her son and suggested to Cody that they should take him to the hospital for treatment. Cody would not permit this and ordered Ms. Rice to treat the child for the scald at home. Ms. Rice testified that at this time she was "terrified" of Cody and that he had threatened to kill her on a number of occasions. The scalding looked pink and much like a sunburn. Ms. Rice bathed her baby son and dressed the scalded tissue. An independent witness saw the scalded area on September 18, 1992, and said that it looked like a sunburn. When the scalding started to blister, Ms. Rice again suggested that they get medical attention for the child, but Cody "exploded," screaming and throwing things. Ms. Rice spent the rest of the night in fear, holding her baby to her chest all night long. She told Cody that she was going to take the child to the doctor on the next day no matter what. On that day Cody beat the child to death.
Now it seems to me that if the child had been suffering from some serious disease that placed the child in danger of death or permanent physical impairment, it could be argued that the mother was obliged, at least morally, to risk her own life and to call in medical care in order to save her child's life; but this was not the case here.[4] It can of course be argued that the mother exercised poor judgment in not having the scald attended to sooner, but it is very hard to argue that her treating the boy at home caused the child to "suffer unjustifiable physical pain," *277 much less "substantial bodily or mental harm" in the form of a life-threatening situation or the other defining conditions of substantial bodily harm. It was Cody Rice that caused the child to suffer unjustifiable physical pain and not Ms. Rice; and there is absolutely no evidence that any failure on the part of Ms. Rice to bring in professional care for the scald injury inflicted by the child's father caused the child to suffer any more or any less pain than that which was intentionally inflicted by the father. Ms. Rice treated the child at home with unguents and coverings and baby pain-relievers. There is no evidence that a doctor could have or would have done things differently.
This whole case and Ms. Rice's having to spend twenty years in prison are based, at the very most, on an error in judgment on her part, an error committed when she decided not to risk her life in order to have the pre-blister scald injury attended to by a doctor instead of treating it at home. There is nothing at all to indicate that the child was any the worse off because of this decision, and certainly nothing to indicate that treating the child at home caused the child to suffer any harm as a result of Ms. Rice's arguably bad decision, much less proof that the child suffered "substantial bodily or mental harm."[5]
Having an understanding of the nature of the charges and the factual background of this case enables us better to understand the injustice of this conviction. This leads me to discuss further the major error in this case, the constitutional violation of due process that was committed by the trial court in allowing this woman to be convicted of a crime for, at most, being neglectful and in having negligently "permitted" her child to suffer by reason of her decision to delay medical treatment for a scald injury suffered at the hands of her murdering husband.
As I have mentioned above (citing Martineau v. Angelone, 25 F.3d 734 (9th Cir.1994)), neither the statute nor our case law has, as of yet, has defined "the precise mental state required" in child neglect cases. 25 F.3d at 739 n. 10. Obviously, the mental state required for a criminal child neglect conviction has to go beyond mere negligent child supervision, or all parents would be in jeopardy. It is a rare parent indeed who does not, at some time or another, fall below the standard of "due care" expected of a *278 "reasonable" parent. What this court should be doing now, and what this court has completely failed to do, is to define the "mental state," the mens rea that is an essential element of the subject crime. Without such definition the present conviction suffers from the same constitutional infirmities that resulted in the release of the convicted defendant in Martineau.
As mentioned, Ms. Rice tried, unsuccessfully, to get the trial court to define the requisite mental element of the charges against her. Ms. Rice requested the trial court to give an instruction to the jury which reflected the necessity for the State to prove something more than negligence, more than mere breach of duty. She wanted the court to instruct the jury that her decision to delay medical attention had to have been made with some kind of guilty "knowledge" that delay in seeking professional medical attention for her son would result in "unjustifiable pain." Otherwise put, Ms. Rice sought to have the jury instructed that if her decision was merely an error in judgment, she could not be convicted of a crime. The trial court refused the instruction. The trial court should have been guided by Martineau, in which a Nevada child neglect conviction was invalidated in a case in which it was also charged (under the same statute as here) that a parent had permitted a child to suffer as a result of a failure to call in timely medical attention. The Martineau opinion makes it very clear that it is necessary for the state to prove that defendants charged with child neglect "knew (or should have known) that the [child's] injuries were serious enough to require immediate medical attention, yet did nothing." Id. at 739. The Martineau court ordered the defendants released on habeas corpus, observing that the state simply did not prove these facts, namely, that the defendants "knew (or should have known) that [the] injuries were serious enough to require immediate medical attention." Id.
Although the majority thinks that the Martineau habeas corpus writ was "[b]ased solely on a lack of sufficient evidence," the lack of evidence in Martineau related to lack of proof of the mental element of the crime, the requirement that defendants in child neglect cases must have known or should have known of the need for immediate medical attention and that they failed or refused to act on this knowledge. I see the thrust of the Martineau case as being disapproval by the federal court of Nevada's failure to provide and apply a properly defined "mental state" as an element of the crime of child neglect.
If I have read Martineau incorrectly, there are other federal cases that deal even more directly with the point. For example, in a case that is very suggestive of the present one, Fabritz v. Traurig, 583 F.2d 697 (4th Cir.1978), cert. denied sub nom. Hopkins v. Fabritz, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979), a mother of a three-year-old daughter came home from a trip to find her daughter ill and covered with bruises. The mother hesitated to get medical care because she was embarrassed about taking the child to the hospital in that condition; so she treated the child at home as best she could. After about eight hours the child stopped breathing. She called an ambulance, but the child died on the way to the hospital. On federal habeas corpus, the Fourth Circuit held that the conviction violated the due process clause of the Fourteenth Amendment because:
[T]he evidence is utterly bare of proof of a consciousness of criminality during her bedside vigil. This may have been an error of judgment, however dreadfully dear, but there was no awareness of wrongdoing on her part.... Without expert medical knowledge to place her on notice of the fatal nature of the child's illness, she treated her as best as she knew. The misjudgment was only to the significance of the symptoms and of the immediacy of the demand for professional care.
583 F.2d at 700.
*279 The majority neglects to discuss the court's failure to instruct the jury that it had to find not only that there was danger in Ms. Rice's delay in bringing in professional help to treat the scalding, but also that Ms. Rice was aware of the danger. Absent an instruction on the necessity to prove knowledge or awareness of the risk, the jury was free to bring in a guilty verdict (as it did) based on negligence alone and on the basis of a mere "misjudgment," as mentioned in the Fabritz case.[6]
I may be overstressing the point, but I must emphasize that a parent's mere failure to call the doctor in case of a child's illness or injury, of itself, cannot amount to criminal conduct. It happens every hour, every day. For criminal liability to be imposed, there must be some "consciousness of criminality," as put in the Fabritz case. All the court required the jury to find here was that Ms. Rice did not seek medical attention for her scalded son. This is not enough to support a criminal conviction. Ms. Rice attempted to interject the mental element, the scienter element, but her instruction was refused by the court.
Ms. Rice tried to persuade the court to define the "willfully" element of violation of NRS 200.508 in terms of scienter or knowledge that her actions were wrong. The instruction offered by Ms. Rice was taken verbatim from Robey v. State, 96 Nev. 459, 611 P.2d 209 (1980). Robey taught that the word "`willful'" when used in criminal statutes with respect to proscribed conduct relates to "an ... omission which is done intentionally, deliberately or designedly, as distinguished from an ... omission done accidentally, inadvertently or innocently." Robey employed such terms as "culpable mind" and "conscious commission of a wrong" to distinguish culpable, criminal misconduct from mere misjudgments and negligence.[7] It was clear error for the trial court to refuse to instruct on the mental element of this crime. The trial court had the opportunity to instruct the jury, in accordance with Robey and thus, at last, to define "the precise mental state required" for conviction in these kinds of cases. Martineau, 25 F.3d at 739. The trial court, contrary to Robey, defined "willfully" as meaning "simply a purpose or willingness to commit the act or to make the omission in question." In other words, to be guilty under this instruction, all Ms. Rice had to do was to be "willing"[8] to "make the omission" to call the doctor to attend to her son's scalding, that is to say, to have made the conscious decision not to seek professional *280 assistance in treatment of the scald, with or without knowledge of the danger involved.[9]
In sum, then, the majority opinion is at odds with Martineau; and it was constitutional error for the trial court not to have instructed the jury that Ms. Rice could not be convicted of a crime unless it found that she "knew or should have known" that a delay in treating her son's scalding would result in the child's suffering "unjustifiable physical pain or mental suffering." Ms. Rice cannot stand convicted for a crime just because she did not call the doctor. She may have exercised poor judgment in not calling in professional medical help when she discovered that her husband had "accidentally" caused her son to be scalded in the bathtub, but this is not the same as knowing that her son would suffer "unjustifiable" pain because she decided to treat him at home.
Although there are a number of errors in this case, I have stressed two errors in contending that this conviction must be reversed. The most obvious error is the court's failure to tell the jury that there were two possible crimes here, the gross misdemeanor and the felony.[10] Ms. Rice was greatly prejudiced by reason of the jury's not knowing that it could have brought in a conviction for a lesser offense, based on the facts in evidence.
Still, the main reason why this conviction must be reversed, and the reason of most concern to me, is that this court has still not defined "the precise mental state required" in child neglect cases and has ignored the ruling in the Martineau case relative to the scienter requirement that a defendant charged with this crime must have known or "should have known" that any failure or delay in calling in medical attention was going to result in "unjustifiable" pain being suffered by the child. 25 F.3d at 739 n. 10. I hate to see this court ignoring the clear constitutional mandate imposed upon us by the Martineau case; but, even worse, I hate to see its dereliction in refusing to deal with *281 the problem of what mental state must be shown in order to establish criminal liability in child neglect cases. This is a matter that clearly must be addressed by the court; and this is the principal reason for my dissenting to the majority opinion.[11]
NOTES
[1] The following is the instruction given to the jury:

The word "willfully," when applied to the intent with which an act is done or omitted, as used in my instructions, implies simply a purpose or willingness to commit the act or to make the omission in question. The word does not require in its meaning any intent to violate the law, or injure another.
[2] The Honorable A. William Maupin, Justice, did not participate in the decision of this matter.
[1] NRS 175.201 provides as follows:

175.201 Presumption of innocence: Conviction of lowest degree of offense. Every person charged with the commission of a crime shall be presumed innocent until the contrary is proved by competent evidence beyond a reasonable doubt; and when an offense has been proved against him, and there exists a reasonable doubt as to which of two or more degrees he is guilty, he shall be convicted only of the lowest.
[2] Since the judgment was entered in this case, the court has given its attention to the mental element in child neglect cases. In Smith v. State, 112 Nev. 1269, 927 P.2d 14 (1996), this court pointed out the difference in the child abuse/neglect statute between the willful abuse crime described in NRS 200.508(1)(a) and the child neglect crime described in NRS 200.508(1)(b). The court conceded that the "statutory definitions of `allow' and `permit' ... are not drafted as clearly as would be preferred" and went on to declare the mental state required for conviction of child neglect under NRS 200.508(1)(b). Smith, 112 Nev. at ___, 927 P.2d at 18. The court decided to read the two statutory definitions of allow and permit "in conjunction and conclude that both definitions establish the same requirement: a person acts unreasonably and is therefore criminally liable if she knows or has reason to know of abuse or neglect yet permits or allows the child to be subject[ed] to it." Id.

The foregoing, necessary elaboration of the mental element of child neglect is all that Ms. Rice wanted presented to the jurynamely, that, as it was put in the Smith case, the court "define[] the state of mind required for a finding of guilt and effectively preclude[] punishment for inadvertent or ignorant acts.
If the jury had been told in this case that Ms. Rice could be held "criminally liable" only if she knew her child was being abused and that she consciously permitted this abuse to continue and that she could not be prosecuted for "ignorant acts," she would have received a fair trial and probably would have been found not guilty.
[3] A first-degree burn is one that involves only the outer layer of skin (the epidermis), ordinarily without blistering. A second-degree burn involves "the epidermis and dermis[, ] usually forming blisters." A third-degree burn involves tissue beyond the skin itself. Stedman's Medical Dictionary 201-02 (5th Unabridged Lawyers' Ed.1982). As described in the text, the scalding was similar to a severe sunburn.
[4] The majority opinion correctly points out that Ms. Rice's decision to postpone professional treatment of the scald was "because she was afraid of what Cody would do to her if she did not [obey him], especially because Cody had threatened to kill them all many times."

Dr. Lon Kepit, a clinical psychologist who specializes in these kinds of cases diagnosed Ms. Rice as suffering from "battered woman syndrome." Dr. Kepit had this to say about Ms. Rice:
Here's the important thing. Because she loses sight of the personal boundaries for herself, she also loses them with Matthew. And really relevant is the fact that she's unable to assess danger accurately.
What is not unusual in these cases where women are abused, is that they truly believe that the child will not be hurt. * * *
And the other point I think that needs to be made here is, that, many cases leaving a relationship that's abusive can be life threatening. She was already in a situation, in my professional opinion, that was life-threatening. There were incidents with Cody with guns and knives and enough violence that she could have essentially been killed, hurt, maimed.
It is also my professional opinion, not only was she a battered woman, but she was under duress and imminent danger....
Almost twenty years ago, Dr. Lenore Walker described and defined the battered woman syndrome in her book The Battered Woman. Dr. Walker has written ten books on the subject of domestic violence, and her term, "battered woman syndrome," is a generally accepted explanation of the psychological impact of the kind of abuse suffered by Ms. Rice at the hands of Cody Rice. The gist of the syndrome as manifested in this case is Ms. Rice's inability to assess the danger to her child and her true belief that her child was not going to be harmed. (See reference to Dr. Kepit's evaluation in the text of this dissent:)
I realize that the battered woman syndrome is just one of a number of theories employed in the social sciences to explain such apparent paradoxes as battered women's not leaving their batterers and putting their children under risk of abuse from a violent domestic partner. The syndrome as delineated and later elaborated by Dr. Walker is based on clinical studies and experimental animal studies of abuse. See, e.g., Martin Seligman, Helplessness: On Depression, Development and Death 75-106 (1975). The battered woman syndrome is often accepted by the courts to explain and justify the actions of women who are accused of crimes. The theory amply explains why Ms. Rice may have delayed her decision to call in professional care until the baby's back started to blister.
[5] Actually, the gross misdemeanor crime is the only crime which the evidence in this case could possibly support. To be guilty of felony child neglect, Ms. Rice's negligence had to result in "substantial bodily harm," which is defined as injury "which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ or prolonged physical pain." NRS 200.060. We must remember that, at most, we are dealing with Ms. Rice's neglect in calling in professional medical care for the child's scalding. As stated, the child's father beat the child to death, fracturing his skull, causing brain injury and death. Any substantial risk of death, permanent disfigurement or impairment of bodily function was entirely attributable to Cody Rice, and no one has suggested that Ms. Rice had anything at all to do with the brutal killing of her son. The only supportable charge against her is that she did not treat the scalding in an "appropriate" manner. The evidence shows that she did what she thought best, that she treated the child at home with home remedies, "dermoblast," vaseline, A & D ointment and pain medication. Any suffering sustained by reason of Ms. Rice's not calling in professional medical care, if present at all, is minimal and certainly not of the kind that was life-threatening or threatening to cause serious and permanent impairment of bodily function. Although one witness believed that the scalding and the low body weight might have contributed to the child's death, it is very clear that the child died as a result of skull fracture and brain injury inflicted by his father and completely unknown to the mother. If there be any crime committed here it is violation of NRS 200.508 without substantial bodily harm. At the very least, this conviction should be reduced to gross misdemeanor child neglect; but I must admit that this would be difficult to do in this case given the State's failure to charge the only crime that could possibly have been committed in this case.
[6] An even closer case than Fabritz is found in the reports of the Military Court of Appeals. In United States v. Robertson, 37 M.J. 432 (C.M.A.1993), a general court martial conviction was reversed on the ground that a father who failed to obtain treatment for his son's eating disorder, failed in proof because of lack of evidence that the father knew and appreciated the magnitude of the child's symptoms. These cases merely confirm the obvious; we should not be sending people to prison for misjudgments and for merely failing to seek medical attention when they do not appreciate the magnitude of the risk in not doing so.
[7] It may be instructive to draw a parallel here to civil liability for punitive damages in cases of negligence or neglect. Ms. Rice's conduct in this case would not warrant a punitive damage award, much less criminal conviction. Punitive damages were denied to the plaintiff in Village Development Co. v. Filice, 90 Nev. 305, 526 P.2d 83 (1974), a case in which there was evidence "to show negligence and unconscionable irresponsibility." Id. at 315, 526 P.2d at 89. Even unconscionable irresponsibility does not constitute the "oppression, fraud or malice, express or implied," necessary to establish the right to punitive damages. Id. at 315, 526 P.2d at 89 (quoting NRS 42.010). The concurring/dissenting opinion in Filice drew a parallel to Nevada Cement Co. v. Lemler, 89 Nev. 447, 514 P.2d 1180 (1973), in which the punitive damages were justified because "the defendant knew that if it continued to spew dust from its cement kiln that damage would ensue" and that it "did so not withstanding such knowledge." Filice, 90 Nev. at 321, 526 P.2d at 93 (Thompson, C.J., dissenting in part). I would argue that the same kind of principle is involved here and that before punitive damages or criminal liability could result from Ms. Rice's conduct, there had to be a charge and proof that "the defendant knew ... that damage would ensue" and that she decided not to call a doctor "notwithstanding such knowledge." Moral and criminal culpability presupposes a conscious disregard of a known risk. The jury should have been instructed along these lines.
[8] It is very difficult for me to understand how the jury could have possibly concluded that Ms. Rice acted voluntarily under these circumstances. She was faced with a sunburn-like scald on her baby's back and a husband who threatened to kill her if she called the doctor. It is my opinion that, as a matter of law, the trial court's definition of "willfully," even if it were correct, would not apply to this case.
[9] In refusing to instruct the jury that "willfully" refers to some kind of guilty knowledge of the consequences of delay in treatment, the trial court apparently relied on Childers v. State, 100 Nev. 280, 680 P.2d 598 (1984), a pre-Martineau case that distinguished child neglect cases from all other criminal cases when it held that in such cases the mere act or omission created criminal liability and that "willfulness" as used in the statute referred to a "general intent," thereby relieving the state from having to prove that the defendant "knew (or at least should have known)" of the consequences of delay. Martineau, 25 F.3d at 741. The Childers case, wrong on its face, can be safely ignored in the light of Martineau, which held that under these circumstances a parent "cannot be held criminally responsible for knowledge of medical risks which are neither readily apparent nor known to [them]." It can be argued, of course, that the pink, "sunburned" appearance of the baby's back put Ms. Rice on notice that immediate medical attention was called for; but, the jury had no opportunity to discuss this issue, for all the jury had to do, under the instructions given by the court, to find Ms. Rice guilty was to conclude that the child was scalded and that Ms. Rice did not call the doctor. This is wrong on its face.
[10] By going for a felony in what at most is a gross misdemeanor case, the prosecution has presented a case with a missing element. The indictment charged that Ms. Rice's negligence or neglect in failing "to seek appropriate medical treatment" "result[ed] in substantial bodily harm." The court defined "substantial bodily harm" as injury which creates a substantial risk of death or which causes serious permanent disfigurement or prolonged physical pain. It is obvious that all injuries to the boy which resulted in a substantial risk of death or caused serious permanent disfigurement were inflicted by Cody Rice. Ms. Rice was not charged with inflicting injuries upon her son. There is nothing to support a conclusion that she permitted her child to suffer substantial risk of death or permanent disfigurement. The only possible charge would be that Ms. Rice's failure to call the doctor to attend to the child's burns was the cause of prolonged suffering. Any prolonged suffering by this little boy was caused by his father who placed him in scalding water and then beat him to death. There is no evidence that any misjudgment on the part of Ms. Rice was the cause of any additional, much less prolonged, suffering by the child. There is no evidence that Ms. Rice caused "substantial bodily harm" to her son. In the absence of this evidence, the conviction should be set aside.
[11] Although, as said, my principal concern in this case is the court's refusal to deal with Martineau and to define the required mental element of the crime of child neglect, it is quite apparent that the sentence was excessive in this case and should be reversed.

The following is the trial judge's evaluation of Ms. Rice:
I don't doubt a word of what all your friends and relatives and employers have said about you. By every single account from every source, you are a positive, productive, intelligent, able person. You're a person with good judgment. You're extremely industrious.
In striking contrast to most of the defendants who come before the Court, you don't have any history of drug abuse, alcohol abuse, unemployment. You have a record every parent would hope for their child: an A student, a good employee, a participant in a program for gifted and talented students, a manager of other employees at a young age. In short, a model life.
I cannot even speculate as to why, if the judge believed what he said about Ms. Rice, he would have, contrary to the recommendation of the presentence report, given Ms. Rice the maximum sentence of twenty years. She may have to serve as much time as her husband, the man who brutally beat her son to death in her absence.
Defense counsel contends that the judge based his decision to give Ms. Rice twenty years on inadmissible matters contained in the Cody Rice's pre-sentence report. During argument, the prosecutor made reference to "Cody Rice's PSI." The sentencing judge made a number of statements during sentencing that support defense counsel's belief that the judge improperly based his sentencing decision on matters contained in Cody Rice's presentence report. The prosecutor made reference to "Cody Rice's PSI" (presentence report); and the judge challenged Ms. Rice's credibility based on material in Cody Rice's presentence reporta report that was not available to defense counsel. Of most concern to me, however, is the judge's "theory" that Ms. Rice was a murderer and that she may actually have collaborated in the killing of her son because she saw her son as "an obstacle to the flourishing of her life with her husband" and an "obstacle to the happiness in her life." This theory, expressed by the sentencing judge, is absolutely incompatible with the evidence in this case. The judge himself saw his "theory" as being "as miserable a picture as one could imagine," but went ahead to suggest that it may have been Ms. Rice's mindset to say: "But suppose you take the son out of the picture...." This idea that Ms. Rice murdered her son, to take him "out of the picture" because he was an obstacle to her happiness is so grotesque that it is difficult to understand why the sentencing judge would put such an outlandish thought on the record, or as he said, "put it out on the table."
That the judge considered Ms. Rice to be a murderer is the only explanation of why he would sentence to twenty years in prison a woman who was charged with delaying the calling of a doctor to treat her son's scalded back. What is most difficult to explain is how the judge could have believed that this mother was so cruel and unfeeling toward her own son as to kill him just because he was an "obstacle to [her] happiness."
I am pleased to see that the majority agrees that the district judge relied on impermissible evidence during sentencing and concur in that judgment.